THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARNOLD E. BIEN, Defendant-Appellant.

Fourth District   No. 4—95—0038

Argued September 18, 1995.—Opinion filed February 8, 1996.

Nancy W. Owen, of Mattoon, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten,

Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Defendant Arnold Bien appeals the trial court's denial of his motion to withdraw guilty plea filed pursuant to Supreme Court Rule 604(d) (145 Ill. 2d R. 604(d)). We affirm in part, reverse in part, and remand.

## I. BACKGROUND

In November 1993, defendant was charged with six counts of aggravated criminal sexual assault and three counts of aggravated criminal sexual abuse. Later defendant was charged with seven more counts of aggravated criminal sexual assault, five more counts of aggravated criminal sexual abuse and three counts of aggravated battery of a child. Defendant stood charged with a total of 24 counts of sex offenses against eight children in a day-care center: 13 counts of aggravated criminal sexual assault, a Class X felony with a nonextended sentencing range of 6 to 30 years (720 ILCS 5/12—14(b)(1), 730 ILCS 5/5—8—1(a)(3) (West 1992)); 8 counts of aggravated criminal sexual abuse, a Class 2 felony carrying a nonextended sentencing range of 3 to 7 years (720 ILCS 5/12—16(c)(1)(i), 730 ILCS 5/5—8—1(a)(5) (West 1992)); and 3 counts of aggravated battery of a child, a Class 1 felony with a nonextended sentencing range of 4 to 15 years in prison (720 ILCS 5/12—4.3(a), 730 ILCS 5/5—8—1(a)(4) (West 1992)).

In May 1994, defendant pleaded guilty to five counts of aggravated criminal sexual abuse and three counts of aggravated battery of a child. The plea was open as to sentence but the State dismissed all other charges and agreed not to recommend more than 20 years on the Class 1 felonies. Defendant indicated he understood the court was not bound by the State's agreement to recommend no more than 20 years on the Class 1 felonies.

The factual basis for the plea established defendant committed numerous acts of sexual abuse against children ages two to five years old in his ex-wife's day-care center between March 1989 and July 1993. The evidence would have consisted of the testimony of victims, parents, police officers, social workers, and medical experts, and would have shown defendant fondled the children, sometimes inserted his finger or penis into their vaginas or anuses, and in some cases concluded by ejaculating. Specifically, the counts covered by the agreement (V, IX, XIV, XX, XXI, XXII, XXIII, and XXIV) charged defendant with committing the following acts for his sexual arousal: touching the torso and leg of a boy, N.G., with defendant's penis (V);

touching the buttocks of a boy, L.R. (then age two), with defendant's penis (IX); touching the penis of a boy, G.O., with defendant's hand (XIV); touching the vagina of a girl, A.M., with his hand (XX); touching the anus of a girl, L.L., with defendant's hand (XXI); placing his finger in the vagina of a girl, K.G., causing scarring and thickening of tissue (XXII); placing his penis in the anus of a boy, J.G., causing scarring and relaxed muscle tone (XXIII); and placing his penis and finger in the vagina of a girl, K.B., causing rounded edges to the hymenal ring and numerous bands of scarring (XXIV).

At the sentencing hearing, a clinical psychologist who specialized in evaluating child abuse victims testified all the victimized children had behavior disorders, emotional disturbances, or mental disorders caused by their sexual abuse. All the children required long-term therapy. The trial court sentenced defendant to 7 years' imprisonment on each count of aggravated criminal sexual abuse and 20 years' imprisonment on each count of aggravated battery of a child. The terms were consecutive, and totalled 95 years' imprisonment.

Defendant filed a motion to withdraw guilty plea and vacate the judgment, alleging (1) his plea of guilty was involuntary because his trial counsel, Gregory Barnes, provided ineffective assistance of counsel in that, *e.g.*, he was not prepared to go to trial and wanted defendant to plead, causing defendant to feel he had no choice but to plead guilty, he misrepresented defendant could easily withdraw a guilty plea; and (2) the consecutive terms of imprisonment were excessive and statutorily improper.

At the hearing on the motion, defendant testified he retained Barnes in late 1993. Prior to Monday, May 16, 1994, when he entered his plea agreement, he had little contact with Barnes. On the Friday before his plea, which was only a week before his trial was scheduled to begin, Barnes had not yet contacted potential defense witnesses and the expert witness for whom defendant had given Barnes $3,000 had not yet arrived. Throughout the weekend of May 13 through 15, Barnes repeatedly told him, either on the telephone or in his office, including Sunday afternoon in the presence of a friend, Karin Poling, to either accept a plea agreement whereby he would receive probation or else lose the case at trial and die in prison. Defendant declined and wanted to go to trial. Defendant went to his ex-wife's uncle's house Sunday evening to discuss a possible plea. He called Barnes from his house and said he wanted to go to trial. Barnes told him to be in his office at 8 a.m. wearing a suit. When defendant arrived, Barnes told him the case was not winnable and he should accept the plea. Defendant again told Barnes he wanted to go to trial. Barnes told him to go to the fifth floor of the courthouse, wait for him, and think about the plea. Defendant did as instructed.

When Barnes arrived at the courthouse, he told defendant the case could not be won, he could not represent defendant, and if defendant did not accept the plea, he would die in prison. Defendant told Barnes "to do what he had to do." Defendant pleaded guilty because Barnes was neither ready nor able to go to trial. Also, Barnes repeatedly told defendant he could change his mind between 16 and 30 days after the plea and the change would be allowed. Barnes told him he would probably get no more than weekends in jail. Defendant admitted no one—including Barnes and the trial court—told him probation was guaranteed. He only partially understood the admonishments, but did not tell the trial court this because he was weighing probation versus life in prison.

Defendant admitted Barnes came to speak with him many times in the jail and sent him 19 letters and copies of correspondence from the State's Attorney and other documents or reports. In each letter, Barnes told defendant to let him know if he had any questions. Barnes sent him "stacks" of Department of Children and Family Services and police reports. Defendant made notes concerning the reports, and he gave the notes to Barnes' secretary.

Karin Poling, defendant's paramour, was with defendant in Barnes' office Sunday afternoon, May 15. When Barnes was asked why no defense witnesses were listed on the trial witness list, he replied he still had a couple weeks to do that. Barnes told defendant if he accepted the plea, he would receive only four to six years' imprisonment or probation. Defendant replied he wanted to fight the charges. That evening and early Monday morning defendant called Karin to say he would fight the charges.

Frank Donald Doyle was defendant's ex-wife's uncle. On Sunday evening May 15, in Doyle's home, defendant asked his advice regarding a possible plea. In Doyle's presence, defendant telephoned Barnes and stated he would not accept the plea.

Lawrence Fichter, the State's Attorney involved with the case, could not recall when the plea agreement was reached, but its terms were finalized before 10:30 p.m. on Sunday, May 15.

The State called Phillip Glosser, defendant's neighbor. On the afternoon of Sunday, May 15, he spoke with defendant after seeing him across the street. Defendant said he was innocent of the charges, but believed he would receive a "better deal," hopefully only a few years' imprisonment, if he pleaded guilty. Defendant said the neighborhood would learn of his plea on next evening's television news. Defendant was not emotional or unsure of his decision, nor did he mention being forced to plead guilty.

Barnes testified he began representing defendant in December

1993. He kept in constant contact with defendant over the phone, through the mail, and in person. He gave copies of all police reports to defendant. Barnes filed a motion to reduce defendant's bond and a motion for substitution of judges. Both were granted. His motion for a bill of particulars was denied, but the testimony at the hearing on the motion helped him prepare trial strategy. His motion for severance of the counts was denied, but at hearing on the motion he was able to pin down the testimony of some prosecution witnesses. He gave defendant a transcript of every court appearance and a notebook in which to record comments about reports concerning the case. The list of trial witnesses was a joint prosecution and defense list so jury members would not think the State had more witnesses than the defense, which he explained to defendant. He gave defendant a list of potential jurors so he could note any jurors that might have bias. Barnes prepared a trial notebook and was prepared to go to trial when the plea was entered, and repeatedly told defendant this.

On Friday, May 13, defendant asked him if he could arrange a plea where he could receive probation. Barnes spoke to the State's Attorney, and then explained to defendant probation was not guaranteed and it would be within the discretion of the judge. Defendant understood. Barnes repeated this explanation to defendant over the weekend. On Sunday, May 15, defendant and Poling came to his office. There was no change in defendant's desire to plead guilty. While discussing the plea, defendant admitted he watched the children at the day-care center during their nap time every Monday while his ex-wife would leave to run errands. This shocked Barnes. Barnes had been told by defendant he visited the day care only two or three times at most during the period of the alleged child abuse. Barnes advised defendant the case should be pleaded, and defendant agreed. Barnes told defendant he could easily file a motion to withdraw his guilty plea if he received a harsh sentence, but there was no guarantee the motion would be granted. Defendant called Barnes that evening and said "Don" wanted to know if he would be taken into custody after he pleaded guilty. Barnes assumed defendant was referring to his uncle. Defendant understood the plea agreement when he accepted it. Barnes never told defendant to plead guilty, and he repeatedly emphasized the decision was defendant's to make. He never told defendant he would not represent him. Defendant did not display or express any confusion about the issues involved.

Barnes explained to defendant no expert could state an opinion he did not commit the crimes. Some of the $3,000 Barnes obtained from defendant was to hire an expert to testify at the sentencing

hearing. Defendant understood all this. They discussed pointing blame for the crimes on defendant's son, who apparently had been accused by one of the children. Defendant agreed to this trial tactic and understood the defense could not contend the children were not abused, given the overwhelming evidence they were.

Regarding witnesses, Barnes obtained necessary information from the mothers of the victims and one of the State's experts by cross-examining them during the bill of particulars' hearing. He spoke with numerous other witnesses, several of which he met by chance during his regular activities. A trial tactic Barnes planned to use was vigorous cross-examination of prosecution witnesses. All but two of defendant's suggested witnesses could not testify at trial because they were only character witnesses. As to defendant's two trial witnesses, Barnes spoke with defendant's ex-wife three times in his office and twice by phone. Barnes told defendant to tell his daughter to make an appointment with him when she was home on leave from the Navy, but she did not call or make an appointment.

Laurie Ann Tharp, Barnes' former secretary, testified she saw defendant visit Barnes' office between two and six times each week from January through June 1994. Defendant replied to all 19 letters sent by Barnes. Defendant more than once expressed satisfaction, and never dissatisfaction, with Barnes' representation.

In rebuttal, defendant testified he never told his neighbor Glosser he was pleading guilty, but only a plea agreement was being discussed. After taking the matter under advisement, the trial court, in a written opinion, denied defendant's motion on all grounds. Defendant appeals.

## II. ANALYSIS

■ Under *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, to establish defense counsel provided ineffective assistance, a defendant must show (1) his attorney's performance fell below an objective standard of reasonableness, as measured by reference to prevailing professional norms, and (2) the substandard representation so prejudiced defendant that there is a reasonable probability, absent the errors, the outcome would have been different. (*People v. Gosier* (1995), 165 Ill. 2d 16, 21, 649 N.E.2d 364, 367.) The standard of reasonableness in guilty plea cases does not depend on a retrospective evaluation of whether counsel's advice was right or wrong, but whether the advice was within the range of competence demanded of attorneys in criminal cases. (*People v. Pugh* (1993), 157 Ill. 2d 1, 17, 623 N.E.2d 255, 262.) Mistakes in trial strategy are virtually unchallengeable as ineffective assistance of counsel. (*People*

*v. Palmer* (1994), 162 Ill. 2d 465, 477-82, 643 N.E.2d 797, 802-04.) To satisfy the "prejudice" requirement in a plea context, defendant must show there is a reasonable probability, but for counsel's errors, defendant would not have pleaded guilty and would have insisted on going to trial. *Pugh,* 157 Ill. 2d at 15, 623 N.E.2d at 261-62.

■ Defendant has failed to show Barnes' advice to plead guilty was outside the range of competence expected of attorneys in criminal cases. Given the considerable evidence, Barnes owed his client a duty to inform him of the possibility and probability of outcomes if defendant chose to proceed to trial. A defense attorney's honest assessment of a defendant's case cannot be the basis for holding a defendant's guilty plea was involuntary. *People v. Witherspoon* (1987), 164 Ill. App. 3d 362, 365, 517 N.E.2d 1169, 1171.

Defendant also contends he pleaded guilty because Barnes misrepresented to him the guilty plea could be easily withdrawn. When a guilty plea was entered because of misrepresentations by counsel, the court should permit withdrawal of the guilty plea. (*Pugh,* 157 Ill. 2d at 13-14, 623 N.E.2d at 261.) However, the trial court was entitled to believe Barnes over defendant and conclude Barnes made no such misrepresentation.

Defendant next argues Barnes was ineffective because his motions and correspondences were only standard forms, and he failed to interview potential witnesses, communicate with defendant, or hire an expert to attack the questioning of the children. The first argument is waived because defendant did not include it in the written motion to withdraw his plea. (See 145 Ill. 2d R. 604(d).) The other contentions are without merit. First, given the evidence the children had undergone sexual abuse, Barnes chose not to attack the children's allegations through the use of an expert, but instead planned to deflect blame for the abuse onto someone else. This strategy fell within the range of professional norms. Second, Barnes chose to have chance conversations with adverse witnesses rather than arranging interviews with them. This tactic arguably enabled Barnes to elicit their prospective testimony and make an evaluation as to their credibility without these witnesses realizing he was doing either. As for defense witnesses, most were character witnesses who could not testify at trial. As for defendant's two trial witnesses, his ex-wife met with Barnes several times, and defendant's daughter never made an appointment to see Barnes. The record shows Barnes kept in constant contact with defendant while he represented him. The trial court did not err in finding defendant's pleas were not rendered involuntary because of ineffective assistance of counsel.

Defendant also cites *People v. Williams* (1982), 93 Ill. 2d 309, 444

N.E.2d 136, as supporting the claim of ineffectiveness since Barnes was disbarred in January 1995 by consent for conduct occurring simultaneous to his representation in this case. There, the court granted a new trial to a defendant sentenced to death where counsel simultaneously represented him and two other defendants in two capital cases before two juries, while at the same time he engaged in conduct unrelated to those cases yet which later resulted in his disbarment. The "unique circumstances" required the defendant's conviction be reversed. (*Williams*, 93 Ill. 2d at 325, 444 N.E.2d at 143.) Defendant has not shown those "unique circumstances" are present, nor did he include this argument in his motion to withdraw plea (145 Ill. 2d R. 604(d)), so he is not entitled to withdraw his plea on this basis.

Defendant has also not shown he probably would have insisted on going to trial but for Barnes' alleged ineffective assistance. There was a sufficient factual basis to sustain defendant's convictions on all counts, and Barnes informed defendant his chances of winning at trial were extremely slim. Throughout lengthy admonishments, the trial court *repeatedly* asked defendant if he understood and if he had been coerced or given any representations in order to obtain his plea. Defendant *repeatedly* responded he understood what he was doing, and no one had coerced him or made any representations to him to obtain his plea. The trial court was entitled to evaluate defendant's current contentions in light of the contradictory record and conclude defendant would have pleaded guilty anyway because defendant believed it was in his best interests. Moreover, the trial court was entitled to believe Barnes, State's Attorney Fichter, and defendant's neighbor Glosser over defendant, his girlfriend, and his uncle, and to conclude defendant manufactured his claims of misrepresentations and coercion. The trial court did not err in denying defendant's motion to withdraw guilty plea.

■ Defendant next argues the trial court erred by violating section 5—8—4(c)(2) of the Unified Code of Corrections (Unified Code), which states: "For sentences imposed under the law in effect on or after February 1, 1978, the aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under Section 5—8—2 for the 2 most serious felonies involved." (730 ILCS 5/5—8—4(c)(2) (West 1992).) Our supreme court recently held a defendant sentenced to consecutive terms under section 5—8—4(b) of the Unified Code (730 ILCS 5/5—8—4(b) (West 1992)) may not be sentenced to consecutive terms that exceed the sum of the maximum extended terms authorized for the two most serious felonies involved, whether those felonies are part of the same or separate occurrences. (*People v.*

*Tucker* (1995), 167 Ill. 2d 431, 437, 657 N.E.2d 1009, 1012.) Here, the two most serious felonies involved were both aggravated battery of a child, a Class 1 felony. (720 ILCS 5/12—4.3(a) (West 1992).) The maximum extended term for a Class 1 felony is 30 years' imprisonment. (730 ILCS 5/5—8—2(a)(2) (West 1992).) Defendant is eligible for a maximum of 60 years' imprisonment. The trial court erred by sentencing defendant to consecutive terms of imprisonment totaling 95 years. Therefore, we remand for sentencing in compliance with section 5—8—2(a)(2).

■ Defendant next argues his sentence of 95 years' imprisonment is excessive, citing only *People v. Norfleet* (1994), 259 Ill. App. 3d 381, 630 N.E.2d 1231. We have reversed and remanded on the consecutive sentencing issue but choose to address this issue in the interest of judicial economy. In *Norfleet*, the defendant repeatedly raped his victim at gunpoint. The trial court imposed four consecutive 25-year terms of imprisonment on four counts of aggravated criminal sexual assault after finding the defendant caused the victim serious injury, lacked remorse, and gave "incredible and outrageous" trial testimony. (*Norfleet*, 259 Ill. App. 3d at 396, 630 N.E.2d at 1243.) The appellate court reversed and remanded, declaring the sentence "greatly exceeded" the sentence in other aggravated sexual assault cases, and the trial court did not find the defendant "utterly beyond rehabilitation" so as to require a practical life sentence. (*Norfleet*, 259 Ill. App. 3d at 396, 630 N.E.2d at 1243.) The special concurrence asserted the sentence was "unjustified by any reasonable view which might be taken of the record" (*Norfleet*, 259 Ill. App. 3d at 397, 630 N.E.2d at 1244 (Johnson, J., specially concurring)), and demonstrated the trial court's "obvious indifference" and "impermissible apathy" to the defendant's rehabilitative potential, given the defendant was 34 years old, employed, and had no prior convictions. *Norfleet*, 259 Ill. App. 3d at 398, 630 N.E.2d at 1244 (Johnson, J., specially concurring).

We disagree with *Norfleet* and its analytical approach which compares other sentences imposed in allegedly similar cases to determine whether the trial court *in the particular case on appeal* has abused its discretion by imposing an excessive sentence. *Norfleet* is not the only appellate opinion using the "comparative-sentence" approach. (See, *e.g., People v. Maldonado* (1992), 240 Ill. App. 3d 470, 608 N.E.2d 499; *People v. Center* (1990), 198 Ill. App. 3d 1025, 556 N.E.2d 724; *People v. Nelson* (1982), 106 Ill. App. 3d 838, 436 N.E.2d 655; *People v. Williams* (1990), 196 Ill. App. 3d 851, 554 N.E.2d 1040.) We deem this approach fundamentally flawed. *People v. Terneus* (1992), 239 Ill. App. 3d 669, 676, 607 N.E.2d 568, 573 (disagreeing with *People v. Harris* (1989), 187 Ill. App. 3d 832, 543 N.E.2d 859).

The comparative-sentence approach is statistically invalid. By evaluating only a handful of published opinions, this approach fails to consider the vast majority of criminal sentences: those in other published opinions, in unappealed cases, and in cases affirmed on appeal by unpublished order. *Terneus*, 239 Ill. App. 3d at 677, 607 N.E.2d at 573.

The comparative-sentence approach also frustrates the purposes of individually tailored sentences as it fails to consider the nuances unique to each case. A trial court's judgment as to the appropriate sentence is entitled to great deference. It is not the role of a court of review to substitute its preference as to the sentence. Sentencing is best left to the trial court because that court can tailor the sentence after balancing the appropriate factors and exercising the discretion our system has wisely placed in trial judges. (*People v. Steppan* (1985), 105 Ill. 2d 310, 323, 473 N.E.2d 1300, 1307.) As this court has stated:

> "[T]he oft-cited standard of review of sentences appropriately recognizes that *no two cases are ever truly 'the same,'* despite how similar they might at first appear. The written words of the record rarely if ever fully capture the intricacies that work into the sentencing court's judgment, including but not limited to that court's direct observations of the defendant's demeanor, as well as the victim's pain and ability to cope." (Emphasis added.) *Terneus*, 239 Ill. App. 3d at 677, 607 N.E.2d at 573.

This view is supported by our supreme court's declaration in similar contexts that comparisons between defendants in different cases are proper, if at all, only when the circumstances of the two defendants are substantially *identical*. See, *e.g.*, *People v. Leger* (1992), 149 Ill. 2d 355, 411, 597 N.E.2d 586, 611 (capital cases); *Launius v. Board of Fire & Police Commissioners* (1992), 151 Ill. 2d 419, 441-42, 603 N.E.2d 477, 487 (administrative disciplines); *cf. People v. Jackson* (1991), 145 Ill. 2d 43, 119-25, 582 N.E.2d 125, 160-63 (codefendants' sentences); *In re Adoption of Syck* (1990), 138 Ill. 2d 255, 279-80, 562 N.E.2d 174, 185 (findings of parental unfitness). In capital cases, the court seems to have recently rejected the permissibility of *any* comparisons. In *Palmer* the defendant argued his sentence of death was inappropriate because the court had vacated the death penalty of other defendants who had committed more serious acts of violence than he. The court declared:

> "This court has, on previous occasions, considered whether a sentence of death in a particular case is disproportionately harsh in comparison with a less severe sanction imposed on a codefendant convicted of the same crime. [Citation.] However, comparative proportionality review is not required either by the Federal

Constitution [citation] or by our death penalty statute [citation]. *'Persons who commit crimes independently are seldom, if ever, similarly situated.'* " (Emphasis added.) (*Palmer*, 162 Ill. 2d at 491, 643 N.E.2d at 808, quoting *People v. Conaway* (1981), 101 Ill. App. 3d 202, 204, 427 N.E.2d 1302, 1304.) The court then distinguished the defendant's cited cases and upheld the defendant's sentence of death after evaluating the record *in his case.* (See also *People v. Johnson* (1989), 128 Ill. 2d 253, 280, 538 N.E.2d 1118, 1130 ("each capital case is unique and must be evaluated on its own facts").) Supreme court precedent supports the proposition a court cannot, for sentencing purposes, compare one criminal case to another based only on a few select criteria. A comparison for sentencing purposes might be proper, if *all* of the facts involved in the case were substantially *identical.* Absent this hypothetical equality of circumstances, which will rarely, if ever, occur, an appellate court must determine whether the trial court abused its discretion considering the facts *in the case at hand,* and not in comparison to arbitrarily chosen facts in arbitrarily chosen cases.

Further, in enacting statutory ranges of imprisonment, the legislature has allowed for the possibility of extended terms, consecutive sentences, or a combination thereof. The legislature envisioned the possibility of lengthy imprisonment, including practical life terms, while at the same time:

" 'No indication has been shown of a legislative intent to lessen disparity of sentences by equating all sentences to those that would be imposed by the most lenient trial courts or approved by the most lenient courts of review.' " (*Terneus*, 239 Ill. App. 3d at 676-77, 607 N.E.2d at 573, quoting *People v. Cox* (1979), 77 Ill. App. 3d 59, 77, 396 N.E.2d 59, 73 (Green, J., dissenting), *rev'd* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.)

From a mathematical standpoint, were the comparative-sentence approach applied indefinitely, *i.e.,* by reducing defendants' sentences to be more in line with lesser sentences given other defendants, eventually all criminal sentences would be reduced to zero—no imprisonment, fines, or other punishment. We refuse to adopt an approach which conflicts with both law and public policy.

■ Defendant, again citing *Norfleet*, argues he is 47, employed, and has no criminal record, so the trial court failed to consider his rehabilitative potential in giving him a practical life sentence. The Illinois Constitution requires courts to determine penalties "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11.) Not *all* criminal defendants must be given an opportunity for

rehabilitation or else life imprisonment would not be constitutionally permissible. The responsibility for balancing between rendering justice and rehabilitating the defendant rests with the trial court. (*People v. Phillips* (1994), 265 Ill. App. 3d 438, 450, 637 N.E.2d 715, 723.) A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. (*People v. Coleman* (1995), 166 Ill. 2d 247, 261, 652 N.E.2d 322, 329.) The goal of rehabilitation should not be elevated over the goal of justice. It offends justice to declare to crime victims and their families no "reasonable" view of the record of their victimization would justify a life sentence for the person who has physically and emotionally brutalized them.

In addition, the legislature has permissibly concluded minimum penalties for classes of offenses are required to protect the interests of society. (*People v. Taylor* (1984), 102 Ill. 2d 201, 206, 464 N.E.2d 1059, 1062.) A trial court may conclude the mitigating factors present in a case do not require giving a criminal defendant the opportunity for rehabilitation when weighed against the aggravating factors. A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 493-94, 508 N.E.2d 708, 716.) A practical life sentence for a defendant who has committed heinous physical and emotional harm to a victim is not at variance with the spirit and purpose of the law. The imposition of a practical life sentence in such a case is not manifestly disproportionate to the nature of the offense when a lesser sentence would send a dangerous message to other potential offenders they may act without concern of being brought to full justice for their crimes, no matter how abominable or abhorrent those crimes may be. The command of the Illinois Constitution to consider the rehabilitative potential of a criminal offender in sentencing does not require a court in every instance to grant the offender an opportunity for rehabilitation. That decision rests with the trial court and will not be reversed absent an abuse of discretion. *People v. Illgen* (1991), 145 Ill. 2d 353, 379, 583 N.E.2d 515, 526.

The trial court, in sentencing defendant, listed the numerous aggravating factors on which it relied in sentencing defendant to 95 years' imprisonment: the disgusting degradation to which defendant subjected the children, the serious physical and emotional harm to the children, the young age of the children, the large number of children victimized, the lengthy period of time over which defendant committed the acts, defendant's breach of the confidence and trust the children placed in him as a worker at the day-care center, and

the need to deter similar despicable conduct by others. Defendant's sentence of 95 years' imprisonment, were it statutorily permissible, would not be excessive or an abuse of discretion by the trial court, despite defendant's employment history or lack of criminal record. Thus, 60 years' imprisonment also would not be excessive. That is the trial court's decision to make.

## III. CONCLUSION

We affirm the denial of defendant's motion to withdraw guilty plea and reverse the trial court's imposition of consecutive sentences totalling 95 years and remand for the trial court to determine an appropriate sentence up to and including the statutory maximum of 60 years' imprisonment.

Affirmed in part; reversed in part and remanded.

GREEN and GARMAN, JJ., concur.