THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRED L. SPENCER, Defendant-Appellant.

Fourth District   No. 4—98—0122

Opinion filed April 1, 1999.

Carlton M. Kagawa, of Law Offices of Carlton M. Kagawa, of Danville, for appellant.

Michael D. Clary, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and Perry L. Miller, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

In October 1997, defendant Fred Spencer was found guilty by a jury of reckless homicide, aggravated driving under the influence of alcohol (DUI), and aggravated driving with a blood-alcohol concentration of .10 or more. 720 ILCS 5/9—3(a) (West 1996); 625 ILCS 5/11—501(d)(1)(C) (West Supp. 1995), 11—501.2 (West 1996). The convictions arise from an automobile accident on December 17, 1995, when defendant drove his pickup truck into the rear of a semi tractor-trailer killing his passenger, JoAnn Abernathy. On December 5, 1997, the trial court entered judgment on the reckless homicide count (the DUI convictions merged into that count) and sentenced defendant to four years' imprisonment. The trial court denied defendant's posttrial and postsentencing motions. Defendant appeals, arguing (1) the trial court erred in admitting into evidence a hospital record showing the results of his blood-alcohol content (BAC) taken at the hospital when he was being treated after the accident, (2) the State failed to prove beyond a reasonable doubt that he committed reckless homicide, and (3) his four-year prison sentence is excessive. We affirm.

On December 17, 1995, defendant drove JoAnn Abernathy, his

girlfriend, to the Fairview Sportsman Club (club) around 1 p.m., dropped her off, and proceeded to a camping area a short distance from the club. Defendant consumed three cans of beer at the camping area before he left, between 6 and 7 p.m., and drove back to the club to meet Abernathy and Roberta Davis. Defendant consumed two cans of beer that evening at the club while he served as bartender. One-half hour before leaving the club, he counted the bar receipts, locked up, and turned on the security system for the building. Defendant testified he had no trouble completing these tasks. Neither Danny Keel, who was present at the club for a short time when defendant was there, nor Davis, a longtime friend of both defendant and Abernathy, believed defendant was impaired. Davis watched defendant count the bar receipts and lock up without any difficulty.

Defendant drove Abernathy and Davis in his pickup truck from the club to the residence of Cecil and Ruth Randall, where he dropped Davis off. According to Davis and defendant, Abernathy had a can of beer in the pickup when they left the club. Davis testified defendant had no problems staying in his lane or maneuvering through intersections. He was not driving erratically or too fast as he drove to the Randalls' residence and had no trouble backing into the Randalls' drive. Both Cecil and Ruth Randall, longtime friends of defendant and Abernathy, watched defendant drop Davis off at their home around 10 p.m. Defendant had no problem backing his truck into or driving out of their driveway. He did not appear intoxicated that night. Ruth watched defendant walk Davis from the truck to the house and defendant did not seem to have any difficulty in walking the few steps from his truck to their front door. Ruth noticed nothing unusual about him or his speech when he said good night. Defendant also testified that he had no trouble driving from the club to the Randalls' residence. Defendant felt he had no problems functioning even though he had consumed alcohol earlier in the evening.

Defendant and Abernathy left the Randalls' residence and headed for Interstate 74. As defendant maneuvered down the interstate's eastbound entrance ramp, he saw a semi truck travelling eastbound in the right lane. The semi did not merge into the left lane as defendant travelled down the exit ramp. A car was travelling behind the moving semi. Defendant attempted to accelerate on the ramp, but was unable to pass the moving truck, so he let his foot off the gas so that the semi and car could travel past him. As he travelled down the merge lane, he was watching the semi and car to his left, then hit the back of the trailer of a parked semi. No vehicles were behind defendant as he drove down the entrance ramp or as he travelled in the merge lane.

Defendant did not see the semi he hit until he collided with it. He

never hit his brakes before the collision because he had no reason to stop. Defendant did not feel intoxicated or that alcohol affected his ability to safely drive his pickup that night.

At about 10:30 p.m., Kevin Kruse, the driver of the semi with which defendant collided, drove down the Interstate 74 entrance ramp to the merging lane located past the end of the entrance ramp and pulled his semi over so that it was completely on the shoulder of the eastbound merge lane. After stopping he checked his mirrors and found his side lights, clearance lights, and four-way flashers working, including a configuration of lights on the back of the trailer. As he was preparing to exit his truck, he heard and felt a big thud. He jumped out of the truck and walked to the rear, where he saw defendant's pickup truck underneath the trailer. The pickup had shoved the rear axles of his trailer so far forward that the tires were hitting the tires directly in front of them. The lights were still operating on Kruse's truck. Kruse radioed for help, told defendant to stay calm, and waited for rescue crews. Kruse smelled alcohol within the pickup when he was speaking to defendant through a crack in the door.

Officer Brian Tison, a Vermilion County sheriff's deputy, answered the dispatch of the accident at 10:49 p.m. The weather conditions were cold and clear and there was no moisture on the roadway when he arrived. At the scene he observed a semi tractor-trailer parked completely on the shoulder of the merge lane. The semi was about halfway along the length of the merge lane, approximately 500 feet east of the end of the entrance ramp. The semi's four-way flashers, red lights, and lights on the back of the trailer, the ones that had not been broken by defendant's pickup, were all operating. Defendant's pickup was wedged underneath the rear of the semi to its windshield.

Based upon Tison's experience, training, and observation, he concluded the speed of the pickup truck at impact was relatively high because the rear axle of the tractor-trailer was broken loose and pushed into the axle in front of it. The impact had moved the entire semi closer to the white line marking the shoulder, where it was sitting crooked. The pavement showed no skid marks leading up to the vehicles. After a rescue squad arrived and extricated defendant and Abernathy from the pickup, Tison saw a crushed beer can on the middle of the front seat.

Tison did not speak with defendant at the scene. When he arrived at the emergency room, where defendant was being treated, he assisted medical personnel in restraining defendant in order to insert an IV. At that time, he smelled an odor of alcohol coming from defendant.

John Howard, an investigator with the Vermilion County sheriff's department, examined and took photographs of the accident scene

beginning about 11:15 p.m. Weather conditions were dark and dry and, by the time he arrived, defendant and Abernathy were gone. Pictures of the scene showed a damp roadway (it began to rain after Howard arrived), but a dry roadway underneath the semi and defendant's pickup. Howard saw no skid marks or any other marks leading up to the location of the accident. All lights, emergency flashers, headlights, and side markers appeared to be working on the semi, which was parked on the shoulder off the merge lane. The semi's trailer was shifted to the left approximately one foot from the impact of defendant's vehicle.

Howard spoke with defendant on December 20, while he was in the hospital. Defendant told him he came down the ramp and was attempting to merge into traffic, but a vehicle in the driving lane prevented him from merging, so he hit the parked truck. Defendant told Howard he was not aware of a beer can being inside the truck, but that there was one in the bed of the truck.

Terry Hume, an emergency medical technician (EMT), was dispatched to the accident scene at 10:52 p.m. He observed defendant's pickup wedged underneath the back end of the semi-trailer all the way up to the pickup's windshield area. The two passengers were pinned in the vehicle and had to be extricated from the pickup. While defendant was in the ambulance en route to the hospital, Hume noticed the smell of alcohol on defendant, and the emergency medical personnel noted this.

EMT Raymond Skidmore also responded to the accident. When he gained entry through the rear window of defendant's pickup, he noticed an odor of alcohol in the vehicle. While assisting in the passengers' extrication from the vehicle, defendant struck a medical worker in the head with his fist and was verbally abusive and combative during the entire 45-minute extrication. Based on Skidmore's training, combative behavior usually indicates that an individual has head injuries, diabetes, or drugs or alcohol in his system. Defendant did not have any head injuries.

Paul and Phyllis Martin, unexpected witnesses, came to court to testify during defendant's trial after reading about it in the newspaper. They had driven past the accident scene and testified that the parked semi under which the pickup truck was lodged did not have any lights on. They did not stop at the accident scene but went down the interstate to an exit where they called 911.

Dr. Ediltrodito Quianzon, a surgeon, was the on-call emergency room physician at United Samaritan Medical Center (USMC) and treated defendant when he was brought to the emergency room following the accident. Any person who comes to the emergency room

with a trauma automatically receives the standard trauma blood work to help in rendering treatment, and this testing was also completed on defendant while he was in the hospital, although Dr. Quianzon never specifically ordered it for defendant. Defendant's blood sample was collected on December 18, 1995, at approximately 12:10 a.m., and the USMC laboratory performed the tests. A printed data sheet (People's exhibit No. 25) showed the results of the tests run on defendant's blood, including the results of a BAC analysis, which was part of the standard blood trauma panel. The test revealed defendant had a BAC of .259.

The BAC analysis is ordered and administered in the regular course of providing emergency medical treatment and is routinely relied upon by doctors in formulating treatment. Dr. Quianzon received the results of the blood testing that was performed, but did not have People's exhibit No. 25 on December 18, 1995. Dr. Quianzon did not use the BAC test results in his treatment of defendant, and the lab report (People's exhibit No. 25) was dated December 29, 1995, 12 days after the accident. Dr. Quianzon himself did not need the BAC results to treat defendant, but the results were important for the anesthesiologist, whose services were required later in the morning when treating defendant.

Dr. C.S. Rakalla, a surgeon and trauma director, assisted in caring for Abernathy after she was brought to the hospital. Abernathy was in a coma, had no blood pressure, and was brain-dead. Abernathy died from multiple internal injuries resulting from the motor vehicle accident.

■ Defendant first contends that the trial court erred in admitting into evidence People's exhibit No. 25, the hospital lab report containing his BAC results. Section 11—501.4 of the Illinois Vehicle Code (Code) provides:

"(a) Notwithstanding any other provision of law, the results of blood tests performed for the purpose of determining the content of alcohol, other drug, or both, of an individual's blood conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule only in prosecutions for any violation of Section 11—501 of this Code or a similar provision of a local ordinance, or in prosecutions for reckless homicide brought under the Criminal Code of 1961, when each of the following criteria are met:

(1) the chemical tests performed upon an individual's blood were ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement authorities;

(2) the chemical tests performed upon an individual's blood were performed by the laboratory routinely used by the hospital; and

(3) results of chemical tests performed upon an individual's blood are admissible into evidence regardless of the time that the records were prepared." 625 ILCS 5/11—501.4 (West 1996).

■ The hospital lab report containing defendant's BAC results was properly admitted. Defendant received the standard trauma blood work when brought to the emergency room, which is automatically ordered for any person who comes to the emergency room with a trauma; the BAC analysis is ordered and administered in the regular course of providing emergency medical treatment; and the lab at the hospital where defendant was treated performed the blood tests. It is of no effect that the written report was dated December 29, 12 days after the accident. 625 ILCS 5/11—501.4(a)(3) (West 1996); *cf.* 625 ILCS 5/11—501.4 (West 1992); *People v. Mueller*, 221 Ill. App. 3d 234, 236-37, 581 N.E.2d 817, 819 (1991) (previous version of section 11—501.4 required that (1) the blood tests be ordered by an on-duty emergency room physician, (2) the written report of the blood tests was received and considered by the emergency room physician in treatment or diagnosis of the patient, and (3) the results of the blood test were material and used by the physician in the treatment or diagnosis of the patient).

Defendant also contends the State failed to prove him guilty beyond a reasonable doubt of reckless homicide because he did not act recklessly in causing Abernathy's death. He claims that despite his BAC reading, the State failed to show that he (or his driving) was impaired on the night of the accident and that, even if he was intoxicated, his intoxication was not causally related to the accident.

■ The standard for reviewing the sufficiency of the evidence in a criminal case is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 169 Ill. 2d 132, 152, 661 N.E.2d 287, 296 (1996); *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). A reviewing court will not overturn the fact finder's verdict unless it is so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. *Brown*, 169 Ill. 2d at 152, 661 N.E.2d at 296. When reviewing a claim under the sufficiency of the evidence standard in a criminal case, it is the reviewing court's duty to set aside a conviction when the evidence raises a reasonable doubt of defendant's guilt. *People v. Minniweather*, 301 Ill. App. 3d 574, 577, 703 N.E.2d 912, 914 (1998).

■ A person is guilty of reckless homicide when the State proves beyond a reasonable doubt that (1) he was operating a motor vehicle, (2) he unintentionally caused a death while operating the vehicle, and

(3) the acts that caused the death were performed recklessly so as to create a likelihood of death or great bodily harm to some person. 720 ILCS 5/9—3(a) (West 1996); *People v. Wilson*, 143 Ill. 2d 236, 245, 572 N.E.2d 937, 941 (1991). A person is reckless or acts recklessly when "he consciously disregards a substantial and unjustifiable risk ***; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4—6 (West 1996); *Wilson*, 143 Ill. 2d at 246, 572 N.E.2d at 942. Whether recklessness has been proved is an issue for the trier of fact. *Wilson*, 143 Ill. 2d at 246, 572 N.E.2d at 942.

■ Recklessness should be inferred from all the facts and circumstances present in the record, viewed as a whole, and may be established by evidence regarding the defendant driver's physical condition. *Wilson*, 143 Ill. 2d at 246, 572 N.E.2d at 942. Even though intoxication is not an element of reckless homicide, evidence of the defendant driver's intoxication is probative on the issue of recklessness. *People v. Smith*, 149 Ill. 2d 558, 564-65, 599 N.E.2d 888, 890-91 (1992). In a reckless homicide prosecution, if the State introduces evidence of intoxication it need only present some evidence of intoxication from which, along with other circumstances, recklessness may be inferred. *Smith*, 149 Ill. 2d at 565, 599 N.E.2d at 891. The reckless homicide statute provides that the fact that a driver was under the influence of alcohol at the "time of the alleged violation shall be presumed to be evidence of a reckless act unless disproved by evidence to the contrary." 720 ILCS 5/9—3(b) (West 1996); *People v. Edmundson*, 247 Ill. App. 3d 738, 742, 617 N.E.2d 446, 451 (1993); see also 720 ILCS 5/9—3(c)(1) (West 1996) (for purposes of section 9—3, a person is considered under the influence of alcohol if the alcohol concentration in his blood is .10 or more).

■ The evidence in this case, taken as a whole, establishes that defendant was reckless in causing Abernathy's death. Approximately 1½ hours after the accident, defendant had a BAC of .259, more than 2½ times the legal limit. Defendant contends the evidence does not show he was impaired on the night of the accident because his friends testified that he had no trouble functioning or driving his vehicle before the accident, and he did not appear intoxicated. However, when evidence of intoxication is conflicting, it is the jury's function to determine the credibility of witnesses and the weight to be accorded the testimony. *Smith*, 149 Ill. 2d at 566, 599 N.E.2d at 891. The driver of the parked semi, police, and medical personnel at the scene and at the emergency room all smelled an odor of alcohol emanating from defendant, and the EMTs who took defendant to the hospital identified him as intoxicated. Defendant was verbally and physically abusive and

uncooperative at the scene and emergency room, although he attributes that to the fact that he was not given any pain medication at the scene and was not told of Abernathy's condition.

Defendant argues that even if he was intoxicated or impaired, his intoxication was not a proximate cause of the accident. Rather, the accident occurred because of hazardous driving conditions; *i.e.*, the semi into which defendant collided was parked in a dangerous position and his only option was to collide with it because the semi travelling next to him failed to move to the other lane so defendant could move from the merge lane into the normal lane of traffic. See *People v. Walljasper*, 97 Ill. App. 3d 81, 82-83, 422 N.E.2d 251, 252-53 (1981) (defendant did not act recklessly because there was no causation between his alleged intoxication and the accident. Defendant hit a slick spot on an otherwise dry roadway, avoided a head-on collision, and veered off the other side of the roadway, hitting the victim. Shortly before the accident, another vehicle skidded off the roadway, hitting the same slick spot. Defendant hit the victim because of the condition of the road, not his alleged intoxication).

We reject defendant's proposition, as this case is not similar to *Walljasper*. No evidence showed the semi that defendant hit was parked in a dangerous position. The accident occurred under clear conditions when the roadway was dry. The semi defendant hit was parked completely on the shoulder of the merge lane, approximately 500 feet from the end of the entrance ramp, and about one-half the distance along the length of the merge lane. The evidence also showed the semitrailer's lights were working; the only contradictory evidence that the semi's lights were not on came from the surprise witnesses, the Martins, who did not stop at the scene. Even assuming, as defendant testified, that the moving semi continued travelling in the lane next to defendant and did not move over, defendant had options other than colliding with the parked semi or running into the moving semi. Defendant testified no vehicle was behind him either in the merge lane or on the entrance ramp, so he could have slowed to let the moving semi pass and continued travelling in the merge lane. Defendant also had to have driven his pickup onto the shoulder of the merge lane to hit the parked semi from behind and wedge his truck underneath the trailer. In addition, no skid marks led up to the point of the collision.

■ Defendant's final argument is that his four-year sentence of imprisonment for reckless homicide is excessive. Reckless homicide is normally a Class 3 felony (720 ILCS 5/9—3(d)(2) (West 1996)), but becomes a Class 2 felony when it is determined defendant was under the influence of alcohol at the time of the offense (720 ILCS 5/9—3(e)

(West 1996)). The sentencing range for a term of imprisonment for a Class 2 reckless homicide conviction is 3 to 14 years. 720 ILCS 5/9—3(e) (West 1996); *People v. Beck*, 295 Ill. App. 3d 1050, 1065, 693 N.E.2d 897, 907 (1998).

Sentencing is a matter within the trial court's discretion and, absent an abuse of that discretion, the trial court's sentence may not be altered on review. *People v. Perruquet*, 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883 (1977). The trial court is in the best position to create a sentence that balances the need to protect society with the rehabilitation of the defendant. See *People v. Reyna*, 289 Ill. App. 3d 835, 841, 682 N.E.2d 1191, 1195 (1997). When sentencing a defendant, the trial court must carefully weigh both the mitigating and aggravating factors to reach a fair and just result, based on the particular circumstances of the offense and the defendant. *People v. Palmer*, 162 Ill. 2d 465, 483-84, 643 N.E.2d 797, 805 (1994). A sentence within the statutory range will not be deemed excessive unless it varies greatly with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Bien*, 277 Ill. App. 3d 744, 756, 661 N.E.2d 511, 520 (1996).

The trial court properly considered the mitigating and aggravating factors, arguments of counsel, and presentencing report in determining defendant's sentence. Mitigating factors included the following: (1) defendant had no previous criminal or traffic record; (2) he was steadily employed before the accident; (3) he received life-long injuries from the accident, which caused him continuous pain and prevented him from working; (4) his criminal conduct resulted from circumstances unlikely to reoccur; (5) he was unlikely to commit another crime; and (6) he was likely to comply with a period of probation.

The trial court recognized that one aggravating factor, whether defendant's conduct caused or threatened serious physical harm to another individual, was encompassed in the reckless homicide conviction. The trial court explained that the "major factor in aggravation" was deterring drunk driving and putting the public on notice of the consequences of drunk driving and drunk driving resulting in a death. See *People v. Martin*, 289 Ill. App. 3d 367, 376-77, 682 N.E.2d 460, 466 (1997) (appropriate to consider deterrence when sentencing a defendant for reckless homicide because reckless homicide is one of the most deterrable offenses).

The trial court did not abuse its discretion in sentencing defendant to four years' imprisonment. Considering the mitigating and aggravating factors, a four-year sentence, one year above the minimum sentence for imprisonment on reckless homicide, is not excessive.

We affirm the judgment of the circuit court of Vermilion County.

Affirmed.

GARMAN and MYERSCOUGH, JJ., concur.