NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230334-U

NO. 4-23-0334

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 6, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| REBECCA J. ROSEBOOM, | ) | No. 22CF220 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed the trial court's judgment, finding the court's consideration of defendant's Facebook post at sentencing was not plain error.

¶ 2     In April 2023, the trial court sentenced defendant, Rebecca J. Roseboom, to 180 days in jail for domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2022)). She did not file a posttrial motion. On appeal, defendant argues the court erred in considering her Facebook post as demonstrating a lack of remorse, resulting in an excessive sentence. We affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. The Charges

¶ 5     In November 2022, the State charged defendant with aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2022)), a Class 3 felony, and domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2022)), a Class A misdemeanor. The State alleged defendant knowingly inflicted bodily

harm on B.W.G., her 15-year-old son, by striking him with a hammer, causing injury to his back. A grand jury later indicted defendant on the same aggravated battery charge.

¶ 6        Prior to trial, defendant was represented by appointed counsel, but she decided to proceed *pro se* the day before her jury trial. The trial court accepted defendant's waiver of counsel after admonishing her in accordance with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). Before jury selection, the State, over defendant's objection, amended the domestic battery charge by removing the phrase "by striking B.W.G. with a hammer."

¶ 7                                B. The Trial

¶ 8        Although the sufficiency of the evidence is not at issue on appeal, we provide a summary of the evidence necessary to understand the mitigating and aggravating factors discussed at sentencing.

¶ 9        In November 2022, defendant lived in a home with her four children: B.W.G.; his brother, 14-year-old B.J.G.; and their two younger half-siblings, 9-year-old B.R. and 7-year-old A.R. On the day of the incident, November 2, 2022, all four children were home. An argument started between B.W.G. and defendant when she informed him she quit her job. B.W.G. explained he "felt, like, a lot of pressure on me because I was the only one with a job." B.W.G. left the home to stay with his father. However, his father brought him back to the home when defendant asked.

¶ 10       Defendant and B.W.G. continued to argue. Defendant asked B.W.G. to get into her vehicle, and B.W.G. complied. After a brief conversation, defendant again began yelling at B.W.G. When he attempted to exit the vehicle, defendant reversed out of the driveway. B.W.G. jumped out of the moving vehicle. He then ran into the yard because he "thought she was going to hit me" with her vehicle when "she started speeding up towards me." Defendant then exited her vehicle

- 2 -

and chased B.W.G. around the house two times. She eventually got back into her vehicle and left the home. B.W.G. went to his bedroom in the basement and locked the door.

¶ 11　　　　When defendant returned home, she continued yelling at B.W.G. through his locked bedroom door. Defendant demanded B.W.G. give her his cell phone so he would not call his father. After defendant started banging on the door, B.W.G. put his back against the door to prevent her from pushing it open. B.W.G. did not open the door or turn his phone over to defendant because he "didn't feel safe" and "didn't want to be able to not contact [his father] or someone to get help."

¶ 12　　　　While barricading his bedroom door, B.W.G. called his guidance counselor, who in turn called the police. Defendant's behavior escalated while B.W.G. was on the phone, as she cursed at B.W.G. and became "louder and angrier." At this point, defendant retrieved a metal rod and a hammer. She began smashing a hole in the door with the metal rod, and then with the hammer. B.W.G. remembered defendant swinging the hammer 10 to 15 times. While breaking open the door, B.W.G. testified he felt defendant strike him in the back with the hammer, as he still had his body pressed up against the door.

¶ 13　　　　Once defendant broke open a hole in the door, she reached the top half of her body through the hole. B.J.G. arrived home at this time and began video recording the incident with his cell phone. B.W.G. recalled that defendant grabbed him through the door, bit him three times on his right shoulder, and scratched him along his chest and back. B.W.G. eventually retreated from blocking the door so defendant would stop biting and scratching him.

¶ 14　　　　Defendant then forced the door open and wrestled with B.W.G. for his cell phone. When she was unsuccessful, defendant picked up the hammer and held it above her head. B.W.G. blocked her hand holding the hammer. B.J.G. intervened to try to take the hammer from defendant.

Both B.W.G. and B.J.G. testified that defendant did not try to swing the hammer while in the bedroom. Shortly thereafter, the police arrived.

¶ 15    Officers Kaleb Merritt and Dakota Park of the Woodford County Sheriff's Office arrived at the home in response to the 911 call made by the guidance counselor. Upon their arrival, both officers observed B.J.G. sitting on the front porch in distress and crying. Merritt spoke with B.W.G. in the garage and examined his injuries, which he described as bite marks, nail scratches, and "a strike of a side part of a hammer" on B.W.G.'s lower back. Merritt observed B.W.G. was in distress and he began crying when describing the incident. Park testified to seeing similar injuries on B.W.G.

¶ 16    Immediately following the incident, B.J.G. observed B.W.G. appeared scared and was hyperventilating. B.J.G. recalled seeing bite marks and red marks on his brother, but he did not remember seeing a bruise on his brother's back. B.J.G. later sent the video he recorded on his cell phone to the police.

¶ 17    The jury found defendant guilty of domestic battery and acquitted her of aggravated battery.

¶ 18                    C. Sentencing

¶ 19                    1. *The State's Evidence*

¶ 20    At the April 2023 sentencing hearing, the State called Bryon Roseboom, defendant's estranged husband and the father of B.R. and A.R. Over defendant's objection, the trial court admitted a photograph of a Facebook post made by defendant. Bryon testified that he took a screenshot of the post sometime in March 2023, after defendant's trial. The post, in its entirety, read:

"Anyone else remember that time the States attorney and a detective from the sheriff's department had to lie—under oath, before a grand jury—to indict me for a felony I didn't commit, after which the public defender told me I didn't stand much of a chance of beating the charges and I better prepare myself for prison time—EVEN THOUGH I was innocent—so I fired the public defender, represented myself in court by doing absolutely NOTHING but listening to the State's witnesses, and was acquitted of the felony the States Attorney and Woodford County detective conspired to charge me with?

The rampant abuse by law enforcement and elected officials in this county is absolutely appalling, and it breaks my heart to think of how many members of our community have been wrongfully charged and imprisoned. Learn your rights, friends. Know them. That's the only effective way I've found to fight back."

¶ 21 Bryon also testified that on November 3, 2022 (the day after the incident), he was granted an order of protection against defendant on behalf of B.R. and A.R. On November 29, 2023, the principal at A.R.'s school called Bryon to take A.R. home early because she was having a "full-blown meltdown." The principal told Bryon that while A.R. was on the playground, defendant had gotten out of her vehicle, went up to the school fence, and waved at A.R. When A.R. tried to run towards defendant, a teacher stopped her. A.R. also told Bryon she had seen her mother while at school.

¶ 22 After defendant interrupted the testimony multiple times, the trial court admonished her, "Okay. Here—here is what won't happen. Nobody has interrupted you, and you're not going to interrupt anyone else. *** I don't care if you represent yourself or you're represented by a lawyer. I do not tolerate that type of behavior." Defendant also moved to strike Bryon's testimony

as hearsay and because "he has been harassing me and stalking me through social media." The court overruled her objection.

¶ 23 The trial court admitted a certified copy of a partial transcript from Woodford County case Nos. 22-JA-30 through 33. The transcript contained defendant's statements from a March 6, 2023, family court dispositional hearing. At that hearing, defendant stated, "I've never denied accountability for what happened and my part in it." Defendant also claimed, "My kids are not abused. I am the parent. I am doing my best. I can only do what I can enforce."

¶ 24 Defendant did not present any evidence.

¶ 25 *2. Defendant's Statement in Allocution*

¶ 26 Defendant asserted she had "been in no trouble since this incident and before this incident." Defendant explained she "went from being a full-time mom of four kids for 15 years to having no contact with them for [5] months. There's no greater punishment than losing your kids, Your Honor. I don't believe that incarceration serves any good to my children, to myself, and especially to the community." She stated that following the incident, she began providing in-home health care to a family friend.

¶ 27 *3. The State's Argument*

¶ 28 The State asked the trial court to consider the evidence introduced at trial and the impact of defendant's actions on her children. Although defendant was found not guilty of aggravated battery, the State maintained "there was unrebutted testimony that her son felt the hammer hit his back." The State characterized defendant's actions towards B.W.G. as "horrific" and noted the emotional impact on B.W.G. and B.J.G.

¶ 29 The State pointed to defendant's Facebook post to show "[s]he's not accepting responsibility for anything that happened." The State focused on defendant's claims law

enforcement was corrupt and told lies about the incident. The State also referenced defendant's statements from the March 6, 2023, dispositional hearing to demonstrate defendant's lack of remorse.

¶ 30    The State asked the trial court to consider three factors in aggravation. First, the State argued defendant's actions threatened serious bodily harm. Next, the State argued a jail sentence was necessary to deter others. The State noted the presentence investigation report (PSI) showed defendant had an outstanding warrant in Tazewell County. Finally, the State argued defendant failed to accept responsibility for her actions.

¶ 31    The State recommended a sentence of between 330 to 364 days in jail with no day-for-day credit, given the "severity of this domestic battery" and the age of the victim. The State maintained a sentence of probation would not be appropriate, as defendant had been "thumbing her nose at the judicial system" for "quite some time."

¶ 32                    4. *Defendant's Argument*

¶ 33    Defendant argued she had "15 years with no instances of abuse, harm, neglect, anything." She stated the guardian *ad litem* in her family court case indicated "the kids love their mother, they miss their mother, they want to see their mother." Defendant maintained that she was not a "horrible person" or a "horrible mother," and that she was "actually, a really good parent." As to responsibility, defendant stated, "I don't refuse to take responsibility for my actions. I refuse to take responsibility for things that I have not done." She further stated, "I never testified that I tried to hurt [B.W.G.] I was trying to get his cell phone." Defendant argued she had "freedom of speech" and reiterated her claim false testimony was elicited during the grand jury proceedings.

¶ 34                    5. *The Sentence*

¶ 35    The trial court stated it considered the trial evidence, the PSI, the financial impact of incarceration, the evidence offered in mitigation and aggravation, defendant's statement in allocution, and sentencing alternatives.

¶ 36    In mitigation, the trial court noted defendant had no prior criminal history aside from a few seatbelt tickets and led a law-abiding life for a substantial period prior to the instant offense. In aggravation, the court found the manner of defendant's offense "particularly threatening" and that deterrence to others was necessary. The court declined to consider in aggravation that defendant was the parent of the victim.

¶ 37    The trial court then addressed defendant's Facebook post. The court clarified it was not considering the portions of the post that criticized public officials, but it was considering "her assertion that *** she's been framed by lies." As to the cell phone video, the court stated:

"That is a particularly damning and disturbing piece of evidence. And it is—it is impossible for any rational human being as a parent or any rational human being, period, to justify the conduct demonstrated in that video. It was so irrational, so violent.

*** [T]hat video shows a very disturbing situation. It shows a person that is without balance in regard to other human beings. It is impossible to reconcile your actions in that video with the actions of a loving and concerned parent. Those are irreconcilable."

¶ 38    The trial court found defendant lacked remorse for her actions, stating, "I think your attitude is—is very disturbing as well that you are completely unrepentant, that you see—seem to see no wrongfulness, including your behavior right now in the courtroom."

¶ 39 The trial court noted it usually favored probation or a similar type of sentence. However, the court found defendant would be unlikely to comply with probation. In support, the court referred to defendant's use of cannabis in violation of a pretrial order and her contact with A.R. in violation of an order of protection.

¶ 40 The trial court sentenced defendant to 180 days in the Woodford County jail and 24 months' probation.

¶ 41 This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43 Defendant alleges the trial court abused its discretion when it considered her Facebook post as evidence of lack of remorse, resulting in an excessive sentence. Specifically, defendant argues her post only maintained her innocence on the felony charge she was acquitted of and did not deny the facts involved in her domestic battery conviction. She concedes she failed to preserve this claim for review but asks us to address it under the plain error doctrine as first-prong plain error.

¶ 44                                    A. Plain Error

¶ 45 The plain-error doctrine is a "narrow and limited exception" to the forfeiture rule which allows a reviewing court to consider unpreserved error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Plain-error review involves a two-pronged analysis. *Hillier*, 237 Ill. 2d at 545. The defendant must first show that a clear or obvious error occurred. *Hillier*, 237 Ill. 2d at 545. If there was clear or obvious error, the defendant must then show either "(1) the evidence was closely balanced or (2) the error was sufficiently grave that it deprived the defendant of a fair sentencing hearing." *People v. Ahlers*, 402 Ill. App. 3d 726, 734 (2010). Accordingly, we must first determine whether any error occurred.

¶ 46                                    B. Excessive Sentence

¶ 47        The Illinois Constitution mandates "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The trial court's sentence must be based upon the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102. The most important factor in sentencing is the seriousness of the offense. *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 38.

¶ 48        "In determining the correctness of a sentence, the reviewing court should not focus on a few words or statements made by the trial court, but is to consider the record as a whole." *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). "An isolated remark made in passing" or "the mere mentioning of an improper fact" is not enough to justify a remand for resentencing. *Reed*, 376 Ill. App. 3d at 128. In other words, if " 'the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence,' " then remand is not required. *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 50 (quoting *People v. Bourke*, 96 Ill. 2d 327, 332 (1983)).

¶ 49        "The sentence imposed by the trial court is entitled to great deference and will not be reversed on appeal absent an abuse of discretion." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38. Great deference is given to the court's sentencing decision as "that court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *People v. Page*, 2022 IL App (4th) 210374, ¶ 52. A court abuses its discretion only when its sentence "is greatly at variance

with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Bien*, 277 Ill. App. 3d 744, 756 (1996).

¶ 50    Defendant contends that, absent consideration of her Facebook post, she would have received a lesser sentence. The trial court's statement at issue is as follows:

> "In looking at this case it's interesting that the defendant argues today that—something about vengeance. And I think she was referring to [the Facebook post]. To the extent that [the Facebook post] is taken as a criticism of public officials, the court gives it no weight. That's not why it's offered. It's offered in regard to her assertion that she—that there was—she's been framed by lies."

¶ 51    Taken as a whole, the trial court's comments do not show it imposed a greater sentence based on defendant's Facebook post. The court only briefly mentioned the post and gave it limited consideration. Importantly, the court was explicit in explaining how it was reviewing the post, giving most of the statements, which criticized public officials, "no weight" at all. In comparison, the court placed a great deal of emphasis on the seriousness of defendant's offense and her violations of a pretrial order and an order of protection. Much of the court's analysis focused on the "disturbing," "violent," and "threatening" nature of defendant's conduct, which was captured on the cell phone video. In fact, the court consistently referred to the video, and not defendant's post, when considering the seriousness of defendant's offense.

¶ 52    We further note the trial court did not rely solely on defendant's Facebook post to conclude she lacked remorse. At sentencing, defendant did not accept full responsibility for her actions, nor did she address the harm she inflicted on her children. The court admonished defendant several times for her disruptive behavior. In finding defendant "completely unrepentant," the court relied in part on defendant's "behavior right now in the courtroom." Moreover, at sentencing,

defendant continued to insist she was "actually, a really good parent." Despite her recent conviction for domestic battery, at the March 6, 2023, dispositional hearing, defendant persisted in claiming, "My kids are not abused." The court had more than enough evidence to conclude defendant lacked remorse, even without the Facebook post. Thus, we cannot conclude the minimal weight the court placed on defendant's post led to a greater sentence.

¶ 53    Based on the record, we cannot conclude the sentence imposed by the trial court is excessive or that the court abused its discretion. Finding no error, we need not consider whether the evidence was closely balanced. Accordingly, we affirm defendant's sentence.

¶ 54                              III. CONCLUSION

¶ 55    For the reasons stated, we affirm the trial court's judgment.

¶ 56    Affirmed.