NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220999-U

NO. 4-22-0999

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 18, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Henry County |
| JOSEPH G. WEST, | ) | No. 22CF62 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Terence M. Patton, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held:*   The appellate court affirmed, concluding that (1) the evidence was sufficient to convict defendant and (2) the trial court did not impose an excessive sentence or abuse its discretion.

¶ 2        In September 2022, defendant, Joseph G. West, was convicted at a bench trial of three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2018)) based upon three separate acts of sexual penetration he committed against R.W., a person under the age of 18 years, when defendant was a family member of R.W. The trial court later sentenced defendant to 10 years in prison for each count and ordered the sentences to run consecutively.

¶ 3        Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt because the only evidence about the alleged criminal acts was the victim's unsworn statement that was recanted and disavowed in trial testimony under oath and (2) his aggregate sentence of 30 years in prison was excessive.

¶ 4        We disagree and affirm.

¶ 5                        I. BACKGROUND

¶ 6        In March 2022, the State charged defendant with three counts of criminal sexual assault (*id.*) based upon three separate acts of sexual penetration he committed upon R.W., a person under the age of 18 years, when defendant was a family member of R.W. The State alleged defendant committed the acts between January 2019 and March 2022. In June 2022, defendant waived his right to a jury trial, and in August 2022, the trial court conducted defendant's bench trial.

¶ 7                     A. The State's Evidence

¶ 8                1. *The Testimony of Andrea Flannery*

¶ 9        Andrea Flannery testified that in October 2021, she worked as "the trainer and the assistant director at the School Age Center at the Rock Island Arsenal." She further testified that she had known defendant, who was her boss in October 2021, for approximately two years. Flannery described defendant as her friend.

¶ 10       In late October 2021, several people from work, including defendant and Flannery, went to a local bar for a Halloween party to have dinner and some drinks. Toward the end of the evening, as they were paying their bar bill, defendant told Flannery, "[T]here's a lot of things that you don't know about me." Defendant was very emotional and proceeded to tell Flannery that he was a child molester. Defendant then showed Flannery a photo from his cell phone of the child victim, listed as " 'my love' " in his cell phone. The picture showed defendant and the child kissing on the lips. Only Flannery and defendant were part of this conversation.

¶ 11       Flannery described herself as shocked by what she heard, explaining that it's "very, very hard to have somebody that you care about so deeply tell you that they're—there's a part of

- 2 -

them that's so traumatized."

¶ 12 Because defendant was Flannery's ride back to the office, they had a very lengthy conversation in the car. Defendant told her that he was abused as a child in Germany and "felt like maybe that's why he was the way that he is." He told Flannery that if his children knew that he was gay, they would hate him. Flannery described herself as "still very comforting to him in that moment."

¶ 13 Flannery told him that she was concerned about defendant's long-term happiness because she knew defendant "wasn't living as who he really was." Flannery told defendant "it needed to stop," but defendant responded that "the victim wouldn't allow it to stop." Flannery told defendant that the victim was a child and defendant was an adult, so he was the one who needed to stop the abuse.

¶ 14 Defendant further told Flannery that physically only he did things to the victim, and the victim did not reciprocate. Defendant told Flannery he would not be able to "to stop today or tomorrow, but that he would try to stop."

¶ 15 Flannery said to defendant that someday the victim is going to get older and become involved in a healthy relationship and then "this information will come out." Defendant responded, "[N]o, he'll never tell." Flannery disagreed and said again that someday the victim will tell what defendant had done to him. Defendant then asked Flannery if she knew what the statute of limitations was for child abuse, and she responded that she did not know.

¶ 16 Flannery further testified that because she is a mandated reporter due to her job, she made a phone call to the Illinois Department of Children and Family Services (DCFS) about what defendant had told her. DCFS told Flannery that she should also call the sheriff's office, which she did.

¶ 17    Since Flannery's conversation with defendant at the end of October 2021, she had not spoken to him.

¶ 18    *2. The Testimony of R.W.*

¶ 19    R.W., the alleged victim in this case, testified that he had turned 17 in June 2022, two months before defendant's trial. He had lived in Alpha, Illinois, for three years with his biological aunt, Heather West, who had adopted him when he was 12. At the time of trial, R.W. lived with his aunt and his four siblings, one of whom was R.W.'s biological sibling that R.W.'s aunt had also adopted. The other three children were adopted siblings, R.W.'s aunt's biological children. Defendant, who is both the husband of R.W.'s adoptive mother and R.W.'s adoptive father, used to live in the home in Alpha.

¶ 20    R.W. and his biological sibling had been in the foster care system for two years before they were adopted. R.W. stated that living with his adoptive parents was better than being in the DCFS foster care system.

¶ 21    R.W. acknowledged that he was testifying in court because of the "charges against [defendant] under my account." He explained that he had been trying to take back the statements he made about defendant since defendant was arrested. He identified in open court Johanna Hager as the social worker to whom he made his statement incriminating defendant. R.W. testified that although she told him he would be able to take back his statement to her, she would not let him do that. Instead, he said that everyone he told about wanting to take back his statement called him a liar.

¶ 22    From the witness stand, R.W. emphasized that "[n]othing ever happened, and that is the truth." R.W. also executed an affidavit prior to trial in which he said his entire discussion about defendant's behavior was a lie.

¶ 23    R.W. testified that he went to the child advocacy center (CAC) in March 2022 for an interview and talked with a woman, who told him the interview was being recorded. The interview lasted for over an hour and what R.W. told her were "not true statements."

¶ 24    R.W. further testified that he was answering the questions as he did because he was "trying to get [defendant] out of the house for a little bit." He explained that his adoptive parents were having fights, which R.W. described as "verbal and physical assault[s], like going both ways. So that's why I was trying to get him out of the house." R.W. thought if he reported something, defendant would "just be gone for a couple days and then everything would go back to regular" because defendant was kicked out "for a little bit" after a prior incident during which his adoptive parents had been fighting, but he was able to come back.

¶ 25    After R.W. reiterated that the statements he made at the CAC were all lies, the prosecutor asked him if he had had an opportunity to watch the recording. R.W. said he had not, but he remembered making the recording.

¶ 26    The prosecutor then asked the trial court to admit the recording of R.W.'s interview as substantive evidence, given that R.W. had, at that point, claimed all of his statements were untruthful and the interview was recorded. Defense counsel objected, but the court overruled that objection. The entire video, which lasted 1 hour and 25 minutes, was then played in open court.

¶ 27    On cross-examination, R.W. again asserted that (1) defendant never touched him inappropriately and (2) he said the things he did on the video "[t]o get [defendant] out of the house temporarily."

¶ 28    3. *The Testimony of Heather West*

¶ 29    Heather West testified that she was the adoptive mother of R.W. and defendant's ex-wife. She divorced him two months before the trial after 10 years of marriage.

¶ 30    Heather testified that in March 2022, there was a domestic assault between defendant and her that caused R.W. to call the police. The domestic assault involved pushing and shoving between her and defendant. When the police arrived, they escorted her off the property.

¶ 31    Heather identified an e-mail she sent in March 2022 to Kiki Diediker, a DCFS worker, in which Heather wrote, in part, the following:

> "On 2-16, Joseph groomed [R.W.] with gift cards without my knowledge[,] and this discovery wasn't made until 3/4/22 when the receipt was found in his underwear drawer and [R.W.] was asked if he had been given any of these gift cards. He also stated he had the Subway gift card given to him as well. These gifts have been an ongoing secretive method of manipulation for several months now behind my back and without my knowledge as a form of love and grooming."

¶ 32    On cross-examination, Heather testified that she never saw any sexual activity or inappropriate behavior between defendant and R.W. She also testified that she and defendant slept together and that if he got up in the middle of the night, she would have been suspicious. However, he never did. She also never heard any inappropriate contact between defendant and R.W.

¶ 33    4. *The Testimony of Charles Franklin*

¶ 34    Charles Franklin testified that he was a detective sergeant with the Henry County Sheriff's Office and interviewed defendant in late October 2021. He did so because of Flannery's report about inappropriate conduct between defendant and his adopted son, R.W. After speaking with defendant, Franklin seized defendant's phone and obtained a search warrant to search it. However, because he found nothing on the phone regarding any images of concern, he closed his investigation at that time.

¶ 35    In March 2022, Franklin reopened his investigation after the Henry County

Sheriff's Office responded to a domestic disturbance in Alpha and DCFS investigator Kristine Diediker notified Franklin that there were new allegations concerning defendant.

¶ 36 As part of his renewed investigation, Franklin attended the March 2022 CAC interview of R.W. and then sought an arrest warrant for defendant. Franklin testified that, based upon certain statements R.W. made in the interview, he went to defendant's residence in Alpha and asked Heather for a watch. She gave him a watch, which was admitted into evidence and had an inscription that said "my love" with a heart symbol and a date of May 25, 2021.

¶ 37 Franklin also testified about two documents that he recovered from defendant's desk at the Rock Island Arsenal. The first document was titled "Me or you?" and had two names on it, R.W.'s first name and the name Joe, written on blank lines next to various questions. It read as follows:

> "Who would win in a dance-off? [R.W.'s first name was then written in.] Who said I love you first? Joe. Who's the better cook? Joe. Who instigated the first kiss? [R.W.'s first name]. Who is always losing things? [R.W.'s first name]. Who says 'I'm sorry' first? Joe. Who has the best jokes? [R.W.'s first name]. Who is the messy one? [R.W.'s first name]. Who sleeps more? [R.W.'s first name]. *** Who has the best taste in music? Joe."

¶ 38 The other document appeared to the trial court to contain love poems or love notes. It read as follows: "You're not just my friend/You're my love. You're not just my love/You're my heart. You're not just my heart/You're my life. You're not just my life/You're my everything."

¶ 39 5. *The Testimony of Johanna Hager*

¶ 40 Johanna Hager testified that she worked for the Braveheart Children's Advocacy Center as a forensic interviewer. At the State's request, the trial court permitted her to testify as an

expert in the field of forensic interviewing and child sex abuse.

¶ 41        Hager testified that she interviewed R.W. twice, once in early November 2021 and again in March 2022. During the first interview in November 2021, R.W. made no disclosure of sexual abuse. During the March 2022 interview, however (which was the video that was played at trial), R.W. made a disclosure of sexual abuse. Hager explained that based upon her experience and training, it is common for child victims to change their statement over time.

¶ 42        6. *The Videotape of Hager's Interview With R.W.*

¶ 43        As noted earlier, the video of Hager's 1 hour and 25 minute interview with R.W. was played in open court after R.W. testified and was admitted as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2022)). The following are some excerpts from that video.

¶ 44        R.W. told Hager that he had lied previously when she interviewed him in November because his family needed defendant's money and support. Hager explained to R.W. the importance of telling the truth, and he responded that he would.

¶ 45        When R.W. asked if the recording would be used in court, Hager responded, "I don't know that. It really depends on what you share."

¶ 46        R.W. explained that he did not mention the abuse by defendant during his first interview because he did not want to move away from his girlfriend, friends, school, and job. He later decided to tell because he feared defendant would abuse one of his siblings.

¶ 47        R.W. told Hager that defendant had touched him inappropriately for over three years. Beginning when R.W. was 13, defendant would reach into R.W.'s pants, grab his penis, and sometimes gave R.W. "a hand-job type thing." On occasion, defendant would make R.W. shower with him, and in the shower, defendant would touch R.W.'s penis and occasionally force R.W.'s

hand down to defendant's penis. Eventually, defendant began using his mouth on R.W.'s penis. Defendant asked R.W. to reciprocate, but R.W. always made up an excuse not to.

¶ 48     Defendant would also attempt to do things anally with R.W. On two occasions, defendant inserted the tip of his finger into R.W.'s anus, but defendant stopped when R.W. said it hurt. On another occasion, when picking R.W. up from an airport, defendant brought sexual lubricant in an attempt to have sex, which R.W. avoided by pretending to be sick. On another occasion, R.W. was taking a shower when defendant barged in, pinned R.W. to the wall, and attempted to penetrate him. However, R.W. was able to get away and make a noise to wake up his aunt.

¶ 49     After R.W. turned 16, defendant would give him alcohol, and sometimes R.W. then passed out. R.W. did not know what happened after he passed out but would wake up in his bed. Defendant would later tell R.W. that defendant carried R.W. to bed. Sometimes after waking up from being intoxicated, R.W. felt aches in "his butt and whole body." On two occasions after waking up from being intoxicated, R.W. noticed semen on his body.

¶ 50     On a few occasions, defendant showed R.W. videos of what appeared to be defendant placing his mouth on R.W.'s penis while R.W. was sleeping.

¶ 51     Defendant often masturbated in front of R.W., including sometimes in R.W.'s room while R.W. was playing video games.

¶ 52     Eventually, defendant started giving R.W. cards and gifts, including a watch with the inscription, "my love." R.W. explained that this was defendant's nickname for him, although R.W. hated the nickname and never wore the watch.

¶ 53                              B. The Defense Evidence

¶ 54     Defendant testified and denied that he had had any sexual or inappropriate contact

with R.W., although he did admit to kissing him. Defendant testified that he kisses "all my kids. I think any parent would kiss their kid." He also testified that he had nicknames for each of his five children. His nickname for R.W. was "my love."

¶ 55 Defendant also denied making a confession to Flannery, explaining that he talked with her only about disciplining children and told her that if he needed to discipline R.W., he would "go down on him hard." He explained that phrase meant that defendant would take things away from R.W., like his phone, his PlayStation, or his car. Defendant never told Flannery he was a child molester.

¶ 56 Defendant acknowledged that (1) he gave the inscribed watch to R.W. as a gift and (2) he had filled out the "Me or you?" form that was found in his desk.

¶ 57 The defense presented no further evidence.

¶ 58 C. The Trial Court's Ruling

¶ 59 After listening to closing arguments, the trial court found defendant guilty of all three counts of criminal sexual assault. In explaining its reasons, the court stated that it found R.W.'s statements in the CAC interview to be credible and corroborated by both Flannery and the gifts defendant gave to R.W. The court noted that R.W. corrected Hager during the CAC interview when she was wrong in discussing some of the details R.W. had provided.

¶ 60 The trial court also found that Flannery's testimony was credible, noting that the court did not see anything in her testimony that would make it believe that Flannery was "intentionally making this stuff up." Nor did the court hear "any evidence as to what motive she would have to do that."

¶ 61 The trial court reviewed all of the testimony and concluded that "based on all of the evidence, I find that the victim's statement at the [CAC] was believable."

¶ 62                                    D. The Trial Court's Sentence

¶ 63            In October 2022, the trial court conducted a sentencing hearing, for which a presentence investigation report (PSI) had been prepared and received by the court and both parties. At that hearing, Heather presented the court with a victim impact statement that was strongly critical of defendant.

¶ 64            Defendant's father testified that defendant was a caring, loving person. His father also testified that defendant was sexually abused as child in Germany and never received any mental health treatment for it.

¶ 65            The State recommended that the trial court impose a 10-year sentence on defendant for each count and noted that these convictions required mandatory consecutive sentences. Defense counsel asked the court to impose the minimum sentence of 4 years on each count, which would amount to an aggregate sentence of 12 years in prison.

¶ 66            Before imposing sentence, the trial court carefully reviewed the evidence to determine which statutory factors in aggravation and mitigation would apply, as well as "any relevant nonstatutory factor, [like] the cost of incarceration and the rehabilitative potential of the defendant." The court found that defendant's complete absence of a criminal history was a mitigating factor, as well as his record of employment and his history of financially supporting the children.

¶ 67            After the trial court's lengthy commentary on (1) the evidence and (2) the presence of any aggravating or mitigating factors, the court sentenced defendant to 10 years in prison on each count, with the order that the sentences would all run consecutively to each other.

¶ 68            This appeal followed.

¶ 69                                    II. ANALYSIS

¶ 70    Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt because the only evidence about the alleged criminal acts was the victim's unsworn statement that was recanted and disavowed in trial testimony under oath and (2) his aggregate sentence of 30 years in prison was excessive.

¶ 71    We disagree and affirm.

¶ 72                    A. The Sufficiency of the Evidence

¶ 73                    1. *The Applicable Law*

¶ 74    The Illinois Supreme Court recently reiterated the familiar standard applicable to a defendant's challenge to the sufficiency of the evidence. In *People v. Jones*, 2023 IL 127810, ¶ 28, the court wrote the following:

> "In reviewing the sufficiency of the evidence in a criminal case, this court asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *Id*. All reasonable inferences from the evidence must be drawn in favor of the State. *Id*. A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id*."

This standard applies in *all* criminal cases, regardless of whether the defendant was convicted by a jury or after a bench trial. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 243 (2009) ("[I]n a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the

credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence."). "In weighing the evidence, a trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Jones*, 2023 IL 127810, ¶ 32.

¶ 75                                  2. *This Case*

¶ 76        Defendant argues he was not proven guilty beyond a reasonable doubt because the only evidence of the alleged sexual assaults was the victim's unsworn statement that was recanted and disavowed in trial testimony under oath. We disagree.

¶ 77        We first note our rejection of defendant's claim that "the only evidence about the alleged acts is the victim's unsworn statement that was recanted." In fact, as noted by the trial court in its careful review of the evidence at trial, the court received considerable evidence that corroborated R.W.'s recorded CAC statement and led the court to believe that statement was truthful. That evidence included Flannery's testimony about how defendant admitted to her he was a "child molester" and his nickname for R.W. was "my love." The court concluded that nothing in the record showed a reason for Flannery to be lying about defendant's statement nor any motive for her to do so, and we deem this conclusion entirely justified.

¶ 78        We need not review all of the evidence of defendant's guilt presented at trial. Instead, we will simply note that it was more than adequate to justify the trial court's conclusion that the State had proved defendant guilty beyond a reasonable doubt of the three counts on which he stood trial. We explicitly reject defendant's baseless claim that the trial court's conclusion that defendant was guilty was "irrational."

¶ 79            B. Defendant's Claim That He Received an Excessive Sentence

¶ 80                                  1. *The Applicable Law*

¶ 81       "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The trial court has broad discretionary powers when selecting an appropriate sentence." *People v. Garcia*, 2018 IL App (4th) 170339, ¶ 37, 99 N.E.3d 571. "The trial court's sentence must be based upon the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102, 126 N.E.3d 703.

¶ 82       "The Unified Code of Corrections *** (730 ILCS 5/1-1-1 *et seq.* (West 2016)) sets forth mitigating and aggravating factors that the trial court must consider when determining an appropriate sentence." *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 54, 141 N.E.3d 320. A defendant's "history of prior delinquency or criminal activity" and the need "to deter others from committing the same crime" are aggravating factors. 730 ILCS 5/5-5-3.2(a)(3), (7) (West 2022). It is a mitigating factor if a "defendant's criminal conduct neither caused nor threatened serious physical harm to another." *Id.* § 5-5-3.1(a)(1).

¶ 83       "The weight to be given to any *proper* factor *** is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Emphasis in original.) *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. The appellate court may not substitute its judgment for that of the trial court merely because it might have weighed those factors differently. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11, 65 N.E.3d 419. Further, a reviewing court presumes that a sentence imposed within the statutory range provided by the legislature is proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16, 138 N.E.3d 743.

¶ 84       A trial court's sentence is an abuse of discretion only if it is greatly at odds with the

spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Geiger*, 2012 IL 113181, ¶ 27, 978 N.E.2d 1061. The trial court's sentence is entitled to "great deference because the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15, 82 N.E.3d 693.

¶ 85                                              2. *This Case*

¶ 86          Defendant argues that his prison sentence was excessive and constituted an abuse of the trial court's discretion. Specifically, defendant argues that based on the aggravating and mitigating factors present in this case, which included (1) defendant's lack of criminal history, (2) his advanced education, and (3) his steady employment, the court abused its discretion when it imposed "an excessive [30]-year sentence." Defendant asks this court to vacate his sentence and remand the cause for a new sentencing hearing. We disagree with his argument.

¶ 87          As we noted earlier, the trial court at the sentencing hearing (1) had received extensive information in the PSI about defendant's background, (2) reviewed all applicable factors in aggravation and mitigation, and (3) carefully weighed the evidence before it in the context of those factors.

¶ 88          Defendant acknowledges that the trial court found several mitigating factors present in this case but complains that the court failed to give those factors enough weight. Specifically, defendant claims that his 30-year sentence "does not reflect his rehabilitative potential." Again, we disagree.

¶ 89          The sentencing range on each conviction was 4 to 15 years, and the trial court imposed a sentence of 10 years on each count, which was well within the statutory range and is therefore presumed to be proper. *Musgrave*, 2019 IL App (4th) 170106, ¶ 56. We also note that,

when imposing sentence, the trial court discussed at length defendant's rehabilitative potential and determined nonetheless a 30-year aggregate sentence was appropriate. We conclude, based upon this record, that the trial court's imposition of the 30-year aggregate sentence for the crimes this defendant committed was far from constituting an abuse of discretion.

¶ 90 Last, we agree with the State that defendant is seeking to have his sentence reduced by comparing his case to others in which a court of review has concluded that a defendant's sentence should be reduced. In *People v. Bien*, 277 Ill. App. 3d 744, 753, 661 N.E.2d 511, 518 (1996), this court stated its disagreement with this comparative-sentence approach because that approach "compares other sentences imposed in allegedly similar cases to determine whether the trial court *in the particular case on appeal* has abused its discretion by imposing an excessive sentence." (Emphasis in original.) In *Bien*, we deemed this approach "fundamentally flawed," noting that it fails to consider (1) the vast majority of criminal cases and (2) the nuances unique to each case. *Id.* at 753-54. We reaffirm what we wrote in *Bien*, reject defendant's comparative-sentence argument, and conclude that the trial court carefully exercised its judgment when it sentenced defendant.

¶ 91                                    III. CONCLUSION

¶ 92          For the reasons stated, we affirm the trial court's judgment.

¶ 93          Affirmed.