NOTICE

Decision filed 08/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230474-U

NO. 5-23-0474

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-1274 |
| | ) | |
| MICHAEL J. SANDERS, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Barberis[*] concurred in the judgment.

## ORDER

¶ 1    *Held*: Defendant's convictions for attempt first degree murder and aggravated battery with a firearm are affirmed where the evidence was sufficient to prove defendant's identity as the offender beyond a reasonable doubt. Defendant was not prejudiced by trial counsel's failure to object to alleged errors by the State. Defendant's sentence was not excessive.

¶ 2    Following a jury trial, the defendant, Michael J. Sanders, was convicted of one count of attempt first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2022)) and one count of aggravated battery with a firearm in violation of section 12-3.05(e)(1) of the Code (*id.* § 12-3.05(e)(1)), and was sentenced to respective, concurrent terms of 38 and 15 years' imprisonment in the Illinois Department of Corrections

_____
[*]Justice Welch participated in oral argument. Justice Barberis was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

(DOC) plus 3 years of mandatory supervised release. On appeal, the defendant contends that the State failed to prove him guilty beyond a reasonable doubt where the sole eyewitness's identification was unreliable; that he received ineffective assistance of counsel where trial counsel's failure to object to two errors by the State prejudiced him; and that his 38-year sentence was excessive where the trial court failed to adequately weigh his potential for rehabilitation as an objective of the sentence and improperly considered during its sentencing determinations conduct for which he had been acquitted. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On October 18, 2021, Eldridge Robinson reported to the police that at approximately 9:48 p.m. shots had been fired at him while he was driving his vehicle near the intersection of Cheryl and Gleason Drive in Rantoul. Officers responded to the defendant's house located at 1327 Cheryl Drive where the shooting had occurred. Though Robinson had not been shot, police observed bullet hole damage to his vehicle. When interviewed by the police, Robinson reported that he had seen three people, only two of which shot at him; that he did not recognize the third person; and that he thought he heard seven to eight shots. He also stated that he had known the defendant since the 1990s when they both lived in Chicago.

¶ 5      Officers learned that during the shooting reported by Robinson, a stray bullet entered a nearby residence. Officer Edgar Garcia was dispatched to 1417 Gleason where a juvenile female had been shot in the arm. Officers took photographs of projectiles on the floor between a bed and the dresser as well as photographs of the damage caused by the projectiles going through a television and other items. One of the projectiles recovered was a 9-millimeter bullet and the other was a .40-caliber bullet. Photographs of the juvenile's injuries were later shown to the jury.

¶ 6    When questioned by police, the defendant stated he was in Chicago the entire day on October 18, 2021. When the defendant was arrested, he possessed two cell phones, but the officer who recovered the cell phones could not access them because they were locked. Further physical evidence was recovered during the investigation, including evidence from search warrants executed for a car that was parked in the defendant's driveway and for the defendant's house. During the search of the car, officers discovered a semiautomatic handgun located in the center console between the front seats and a backpack containing two .40-caliber bullets. The officers determined that the vehicle belonged to Eileen Davis. Receipts and traffic citations belonging to Antwian Davis were found in the vehicle. During the search of the house, officers found a variety of ammunition: .32-caliber auto and .38 special caliber rounds, .45-caliber Colt rounds, and .22 short caliber rounds.

¶ 7    From the driveway of the defendant's house, police recovered approximately 23 total shell casings from three different caliber firearms. Officers observed that the shell casings were in three distinct groupings at the top, middle, and end of the driveway. A forensic scientist specializing in firearms identification analyzed the 23 shell casings and concluded there were three different firearms used based on the cartridges recovered: a .9-millimeter Luger, a .22 long rifle caliber, and a .40-caliber Smith and Wesson. No weapons were ever recovered.

¶ 8    The defendant was charged with three counts of attempt first degree murder of Robinson based on the theory of accountability[1] (*id.* § 9-1(a)(1)), one count of aggravated battery with a firearm based on the theory of accountability (*id.* § 12-3.05(e)(1)), and one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)).

---

[1]A defendant is accountable for the conduct of a codefendant when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2022).

¶ 9                          A. State's Motion *in Limine*

¶ 10    Prior to trial, the State moved to admit evidence of a second shooting that took place on November 29, 2021, for the limited purpose of showing the defendant's intent. The State argued the second shooting showed that the defendant intended to kill Robinson after the first attempt on October 18, 2021, was unsuccessful. Defense counsel objected to the State's motion, arguing it would create a trial within a trial because Robinson's identification from the second shooting was unreliable. Defense counsel pointed to the fact that Robinson did not identify the defendant as the shooter in the November incident until the third time he spoke with police, nearly nine months later. The trial court overruled the objection concluding this was a credibility issue for the jury to decide and held that the evidence would be admissible for the limited purpose of showing intent.

¶ 11                                 B. Trial

¶ 12    At trial, the State alleged the defendant was accountable for the actions of those that shot at Robinson, even if he did not fire a weapon himself. Robinson testified as a witness for the State. Robinson testified he had known the defendant and the defendant's ex-wife, Lucille Sanders, since approximately 2018. Robinson stated that giving testimony against the defendant was difficult for him because he knew the defendant's kids and his family. He stated that he and the defendant had played cards and had gone to Las Vegas together. He had spent time at the defendant's house watching the Super Bowl and at holidays.

¶ 13    Robinson testified that on October 18, 2021, he spoke with the defendant, and they made plans to get together later to discuss money the defendant owed to Robinson. When Robinson arrived at the defendant's residence, four people came out of the house: the defendant, Antwian "A.D." Davis, Rory "Ro" Nelson, and William Gray. Robinson refused to enter the residence after he observed that each person there was armed with a firearm, so the defendant came out to talk to

him. The defendant told Robinson to come back in 15 minutes, explaining that everyone was armed because the defendant had been arguing on the phone with a person that had threatened to shoot up his house. Robinson left and drove back roughly 15 minutes later.

¶ 14    When Robinson got to the corner of Gleason and Cheryl Drive—the intersection down the street from the defendant's house—as he was preparing to turn onto Cheryl Drive, he saw the defendant, Nelson, and Gray standing "in the same spot in front of the house" in the driveway of the defendant's residence. Before Robinson could make the turn onto Cheryl Drive, gunshots were fired in his direction. Robinson testified that he "paused in the turn" in the middle of the intersection before proceeding straight through the intersection down Gleason Drive. He headed directly to the police station where he reported the incident. According to Robinson's testimony, Gray was the first to fire his weapon in Robinson's direction. Robinson then saw Nelson and the defendant begin to fire their weapons as well, with all three shooters firing off "maybe over 30 rounds." Robinson testified he clearly saw the defendant fire a gun towards him. He stated that Davis was the only one who did not come outside of the defendant's house when Robinson came back around the second time. When asked if he could clearly see the defendant firing a gun towards him, Robinson answered in the affirmative.

¶ 15    On direct examination, the State read out loud a phone number to Robinson and asked if he recognized it: "Do you know this phone number? It's area code (217)-991-2736." Robinson replied that it was one of the defendant's phone numbers. He stated he knew the number belonged to the defendant because the defendant had called and texted him from that number. Robinson testified he had multiple numbers saved in his phone for the defendant; he explained, however, he did not have them saved under the defendant's name. Robinson also was asked if he recognized another phone number (217)-480-1337, and he responded it was Lucille's number. He testified

5

that he knew it was her number because they talked every day. Robinson admitted to being in a romantic relationship with Lucile beginning in November 2021, but he denied being in such a relationship with her prior to that even though the defendant believed they were sleeping together.

¶ 16 On cross-examination, when defense counsel asked if he could remember any of the defendant's other numbers, Robinson indicated he was not able to do so without looking in his phone:

"Q. What are his other numbers?

A. You know what? They're in my phone.

Q. Oh, you don't know them off the top of your head?

A. No."

¶ 17 On cross-examination, Robinson admitted that he did not originally tell police about speaking with the defendant earlier that day. He denied recalling that he initially told police there were only two people shooting at him. Robinson insisted that Gray fired first and that he had seen Gray's face before. He denied telling officers he had known the defendant since the 1990s when they lived in Chicago, insisting he did not meet the defendant until 2018. When pressed on the inconsistencies between his prior statements to police and his present testimony, Robinson started having trouble answering defense counsel's questions, saying "every question is going to be I don't remember" and that he is "ready to just move to get over it." After Robinson answered "I don't remember" to numerous questions, the court declared a recess to address his unwillingness to testify. After the State spoke with Robinson, he continued testifying.

¶ 18 The State also questioned Robinson about an incident that occurred approximately one month after the charged offense, with the trial court instructing the jury to only consider the evidence for purposes of the defendant's intent. Robinson testified that on November 29, 2021, he

6

was shot at again while driving his vehicle near the overpass at Prospect and Interstate 74. He stated that Lucille and "Little Michael" were with him at the time. Robinson recounted that he noticed Davis driving the car next to his with the defendant in the passenger seat before four gunshots were fired in his direction. None of the shots hit Robinson's vehicle.

¶ 19    Robinson testified that recently he had started a romantic relationship with Lucille. Robinson and claimed the relationship started just after the shooting in November, though he admitted the defendant suspected them of sleeping together prior to the first shooting. Robinson further admitted that when he met with police directly after the November 29 shooting, he told them that while he suspected the defendant was the shooter, he did not actually see the person who shot at him. When he spoke with the police again on December 27, Robinson reaffirmed that he did not see the shooter. It was not until August 2022, nine months after the November shooting, when Robinson spoke with the police for a third time that he told them he had seen the defendant lean out of the front passenger seat holding a large chrome revolver that he fired in Robinson's direction.

¶ 20    On redirect examination, Robinson testified he did not tell the truth initially about the November shooting because Lucille was having an anxiety attack, "Little Michael was screaming," and they did not want the defendant to get into any more trouble. Robinson testified that the defendant threatened him between the October and November shootings via text messages and phone calls, telling Robinson to stay away from Lucille.

¶ 21    Police collected four shell casings from the overpass near where Robinson reported being shot at in November. These shell casings were determined to be semiautomatic .40-caliber bullets. An investigator for the public defender's office later explained that revolvers do not eject the empty shell casings out of the gun like semiautomatic weapons do. The forensic scientist confirmed that

the .40-caliber bullets from the November shooting came from the same gun that fired the .40-caliber bullets in the October shooting.

¶ 22    Steve Guess, an investigator for the public defender's office, testified on behalf of the defense. On the night of October 18, 2022, exactly one year after the shooting, he went to the scene of the incident on Cheryl Drive to observe the conditions. Guess stated that there were several trees and some streetlights in the area; nevertheless, he described the neighborhood as "very dark" due to poor lighting. Guess observed the streetlight at the T-intersection of Gleason and Cheryl Drive that randomly turned off and on. He determined the distance between the closest edge of the driveway to the streetlight at the intersection was 175 feet. Guess stated that when standing at the intersection of Gleason and Cheryl, he could not see any identifying features of individuals standing in the defendant's driveway due to the distance and darkness.

¶ 23    Guess took two photographs which were shown to the jury. One photograph depicted the area to the east of the defendant's house towards the intersection of Gleason and Cheryl, and the other photograph depicted the area to the west. He testified the streetlights did not illuminate the entirety of the defendant's driveway. Guess also recorded a video as he was walking on Cheryl Drive to the east toward the intersection and a video facing towards the west, towards the defendant's house. These videos were shown to the jury. On cross-examination, Guess admitted he did not record a video of the scene while driving north on Gleason approaching the intersection as Robinson did on the night of the shooting.

¶ 24    The trial court read for the jury the following information, of which it took judicial notice: that on October 18, 2021, at 9:45 p.m. there was no cloud cover in Rantoul, and the moon was lit up 96.4%, while on October 18, 2022, there was 75% cloud cover at 9:45 p.m., and the moon was lit up 40.7%.

8

¶ 25    The defendant's neighbor, Jeff Warner, testified on behalf of the defense. Warner's house was located at the corner of Gleason and Cheryl. On the night of October 18, 2021, he had just laid down for bed when he heard gunshots outside. Warner looked through his bedroom window and saw two people standing on the opposite corner from his house with numerous cars leaving the area. Warner stated he could not see any details of the people because it was completely dark out, and there was insufficient outdoor lighting to make out identifying features. Warner said the only illumination came from the single streetlight at the intersection and the brake lights of the cars that were leaving.

¶ 26    Makayla Sanders, the defendant's daughter, testified that on October 18, she saw the defendant and his friend in a car at the defendant's house between five and six in the evening. The defendant told her he was leaving to go to Chicago.

¶ 27    The trial court granted the State's motion to admit into evidence cell phone records pertaining to the phone number (217) 991-2736, which Robinson testified belonged to the defendant. One such record was for October 18, 2021, and the other was for November 29, 2021. The State argued that those records would show that the phone number identified as the defendant's was present in Rantoul on October 18, 2021, and would rebut Makayla's testimony that the defendant went to Chicago and was not present at the time of the shooting.

¶ 28    James Sean Barnwell, who worked for the Mid-States Organized Crime and Information Center, testified on behalf of the State. Barnwell explained that the cell phone data showed the general location of a cell phone with the number (217) 991-2736 for the time frames in question on October 18 and November 29, 2021. These records showed that the cell phone had been in the area of the defendant's residence at the time of the shooting on October 18 and in the area of the overpass near Interstate 74 on November 29 when the second shooting reportedly occurred.

9

Further, the cell phone data showed that the phone number which Robinson testified belonged to the defendant called the phone number which Robinson testified belonged to Lucille approximately three minutes after the November 29 shooting.

¶ 29    During closing argument, defense counsel emphasized Robinson's inconsistent statements, the lack of corroboration of the cell phone number, the lack of direct evidence that the defendant ever possessed or fired a gun, and the subjectivity of the forensic expert's determination that the bullets from the October and November shootings matched. The State's closing argument focused on Robinson's testimony and the theory of accountability. The State acknowledged that the phone records only put a cell phone at both shootings but argued the evidence provided at trial was sufficient to connect it to the defendant:

> "Cell phone testimony puts a phone at both shootings. Doesn't put the defendant, that's not how cell phone data works. But it puts a cell phone. How do we know that's the defendant's cell phone? You heard from Eldridge Robinson, he said that's the number. In arguments it was said well, what about the other numbers? Do you have them memorized? He said no, let me show you in my phone. Defense shut that down pretty quick. They didn't want you to see what was in his phone because they know exactly what it would have shown."

¶ 30    During deliberations, the jury asked for the definition of "abet" and what it means to be "armed with a firearm." The trial court responded that the definition for abet was to "encourage, incite, or set another on to commit a crime. This word is usually applied to aiding the commission of a crime." The trial court further responded that armed with a firearm was defined as "being on his person, or in his hand."

10

¶ 31    Following deliberations, the jury found the defendant guilty of count 3, attempt first degree murder, and count 4, aggravated battery with a firearm under the theory of accountability. However, the jury found the State failed to prove the defendant had personally discharged a firearm during the attempt first degree murder. The defendant was sentenced to 38 years for the attempt first degree murder to be served concurrently with a 15-year sentence for the aggravated battery with a firearm.

¶ 32                                    C. Posttrial

¶ 33    The defense made a motion for acquittal, or in the alternative, a new trial. Defense counsel argued that the court erred in granting the State's motion to introduce evidence of the second shooting because Robinson's identification of the defendant was unreliable; there was no physical evidence tying the defendant to the shooting; and no weapons were ever recovered. The motion was denied.

¶ 34                                    D. Sentencing

¶ 35    At sentencing, the trial court first addressed whether to impose consecutive sentences for attempt murder and aggravated battery with a firearm. Because both offenses were Class X felonies, mandatory consecutive sentences would be required if the court found there was an infliction of severe bodily injury. The trial court found that while the minor victim was shot in the arm, the facts presented at trial did not support the conclusion that the injury qualified as severe bodily harm. The trial court then discussed whether consecutive sentences were necessary to protect the public. During its consideration of whether to impose discretionary consecutive sentences, the trial court discussed the important mitigating and aggravating factors. The trial court declined to impose discretionary consecutive sentences and sentenced the defendant to 38 years for the attempt first degree murder and 15 years for the aggravated battery with a firearm to be

11

served concurrently. The defense filed a written motion to reconsider the sentence. The court, noting the large sentencing range and the fact that it did not impose the discretionary consecutive sentences, denied the motion.

¶ 36                                  II. ANALYSIS

¶ 37    In his opening brief, the defendant argued that the State failed to prove him guilty of attempt first degree murder and aggravated battery with a firearm beyond a reasonable doubt where the sole eyewitness's identification was unreliable; that he received ineffective assistance of counsel where trial counsel's failure to object to two errors by the State—a leading question and an insinuation of unintroduced evidence—prejudiced him; and that his 38-year sentence was excessive where the trial court failed to adequately weigh his potential for rehabilitation as an objective of the sentence and improperly considered during its sentencing determination conduct for which he had been acquitted.

¶ 38                          A. Sufficiency of the Evidence

¶ 39    We first turn to the defendant's contention that the State failed to prove him guilty beyond a reasonable doubt. Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. In determining whether there is sufficient evidence to convict, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004).

¶ 40    A defendant's conviction will be overturned where the evidence is so "unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Ortiz*,

12

196 Ill. 2d 236, 259 (2001). However, it is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the fact finder. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. A reviewing court gives the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007). It is the duty of the trier of fact to assess the credibility of the witnesses, assign the appropriate weight to testimony, and resolve discrepancies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 41     The defendant maintains the State's case against him hinged on the unreliable identification from a sole eyewitness. He argues that Robinson's identification was unreliable where the evidence demonstrated that Robinson would have had an insufficient opportunity to view the shooters: the incident occurred quickly; Robinson's attention was focused on driving away from the gunshots; and the incident occurred at night in a location with poor outdoor lighting. He argues further that the presence of a firearm and the stressful situation created by the shooting impeded Robinson from making a reliable identification and rendered it improbable that he could see any identifying features of the shooters.

¶ 42     The State has the burden to prove beyond a reasonable doubt the identity of the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "An identification will not be deemed sufficient to support a conviction if it is vague or doubtful." *Id.* Reviewing courts assess the reliability of an identification under the totality of the circumstances, considering: (1) the witness's opportunity to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the witness's identification. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), which our state supreme court adopted as the applicable factors in *People v. Piatkowski*, 225 Ill. 2d 561, 567

13

(2007). A reviewing court applies the *Biggers* factors where, as here, a defendant asserts the evidence was insufficient to prove his identity.

¶ 43 After the appeal had been fully briefed, and prior to oral argument, the defendant filed a motion for leave to cite a newly issued case as additional authority, *People v. Johnson*, 2024 IL App (1st) 220494, *pet. for leave to appeal granted*. We note the State neither objected nor filed a response to the defendant's motion. The motion, which was taken with the case, is hereby granted. The defendant notes the court in *Johnson* discussed the importance of analyzing the reliability of eyewitness identifications using the *Biggers* factors. *Id.* ¶ 3. The *Johnson* court, citing a 2021 law review article, explained it must weigh the totality of the circumstances to evaluate the likelihood of misidentification, as opposed to the likelihood of identification. *Id.* ¶ 72. The defendant maintains the analysis in *Johnson* is relevant to the evaluation of whether Robinson's eyewitness account was reliable and, consequently, whether the State's evidence was sufficient to prove he was responsible for the shooting beyond a reasonable doubt. The defendant contends that instead of arguing that Robinson's eyewitness identification was reliable based on the factors from *Biggers*, the State focused in its brief on Robinson's prior familiarity with him in an attempt to demonstrate that his eyewitness identification was reliable, going so far as to say that Robinson "did not need to recall specific facial features of the people who shot at him" and that a person can identify a friend "even though he or she could not make out the specific details of that friend's face."

¶ 44 In *Johnson*, the jury delivered a split verdict, finding the defendant guilty of first degree murder of one victim while acquitting him of the attempted first degree murder of another victim, although both were shot by the same assailant at the same time. *Id.* ¶ 6. At trial, the State presented no physical evidence tying the defendant to the shooting, relying instead on the testimony of four

eyewitnesses. *Id.* In evaluating the opportunity the eyewitnesses had to view the offender at the time of the offense, the *Johnson* court stated that each eyewitness caught a fleeting glimpse of the shooter, mainly from behind, amid an extremely stressful situation. *Id.* ¶ 33. The *Johnson* court determined that the first *Biggers* factor—opportunity to observe—benefitted the defendant. *Id.* ¶ 37. In response to the dissent's heavy reliance on the fact that two of the eyewitnesses were familiar with the defendant prior to the shooting, the *Johnson* court said, "*Biggers* contains no exception for eyewitness familiarity." *Id.* ¶ 89.

¶ 45    First, we note although we may consider a decision of our sister districts as instructive, we are not bound by their decision. See *O'Casek v. Children*'s *Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). Second, this case does not aid the defendant as the First District based its holding on facts not present here. Finally, as the dissent in *Johnson* correctly notes:

>"This court has repeatedly held that descriptions of the offender are unnecessary when the eyewitness knows the suspect and can identify him by name. See, *e.g.*, *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 73 (stating that 'concern about a witness's physical description of the offenders disappears when the witness knows the suspect' and reasoning that because the witness knew the defendant and identified him by name, '[i]t would have been unnecessary and redundant for [the witness] to give the police a physical description' and that '[t]he absence of an initial description of the offender does not diminish the reliability of [the witness's] identification')." *Johnson*, 2024 IL App (1st) 220494, ¶ 130.

Also see *People v. Williams*, 2015 IL App (1st) 131103, ¶ 74 (identification sufficient where eyewitness knew defendant's nickname and had met him "on multiple occasions" over the past two to three years); *People v. Sullivan*, 366 Ill. App. 3d 770, 783 (2006) (identification sufficient where eyewitness had seen the defendant "plenty of times" and identified him by his nickname on

the night of the crime); *People v. Robinson*, 42 Ill. 2d 371, 375-76 (1969) (person identified known to trial witness before crime; identification independent of and uninfluenced by any pretrial confrontation); *People v. Nelson*, 40 Ill. 2d 146, 151 (1968) (defendants known to eyewitnesses before commission of offenses). The appropriate consideration here, is after applying the *Biggers* factors, was Robinson's identification of the defendant sufficiently reliable.

¶ 46                                    1. Opportunity to View

¶ 47    The defendant focuses the greatest portion of his argument attacking Robinson's opportunity to view. While a witness's ability to view the offender has been described as the "most important" factor in the reliability analysis, it is not dispositive as *Biggers* instructs that all factors are to be considered with no single factor conclusively establishing the reliability of identification testimony. *Johnson*, 2024 IL App (1st) 220494, ¶ 32; *In re O.F.*, 2020 IL App (1st) 190662, ¶ 32 (citing *Biggers*, 409 U.S. at 199-200). Variables such as distance, lighting, and length of time can affect the witness's opportunity to view the offender. *Johnson*, 2024 IL App (1st) 220494, ¶ 32. The inquiry is "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40.

¶ 48    Here, the defendant argues that Robinson had an insufficient opportunity to view the shooters as he had only a very brief opportunity to observe as they opened fire on him. He further argues that given the distance, poor lighting, and chaos of the moment, it would be exceedingly difficult, if not impossible, to provide an accurate identification. The State counters that Robinson was not tasked with identifying a stranger who had shot at him as Robinson had known the defendant for a number of years. Robinson, who had left the defendant's house less than 15 minutes before, testified that when he returned, he saw the defendant and two other individuals standing in

16

the driveway as he approached the intersection near the defendant's house and that he clearly saw the defendant fire a gun toward him. Robinson's identification of the defendant was bolstered by the fact that he had known the defendant for a number of years prior to the incident.

¶ 49    We find unpersuasive the defendant's argument that Robinson's identification was unreliable given the very brief opportunity he had to observe the shooters before they opened fired. "The brevity of a witness's opportunity to view, by itself, will not discredit an identification, although it is a factor that a trier of fact may consider when weighing the testimony." *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 45 (evidence was not insufficient, although one witness saw one of the shooters for 5 to 10 seconds and another witness observed him for less than 5 seconds); *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification was found to be reliable, although "the entire incident took less than a minute"). The amount of time an eyewitness has to see the offender is just one factor that a factfinder can consider in weighing testimony. *Thompson*, 2020 IL App (1st) 171265, ¶ 45.

¶ 50    Next, the defendant argues that given the distance between the intersection and the defendant's driveway, Robinson's identification was unreliable. In support of his argument, the defendant relies on academic studies designed to test eyewitness perception at various distances, which have uniformly shown that the ability to make an identification diminishes rapidly as the distance between the witness and the suspect increases. As these academic studies were not presented at the trial court below, we will not consider them on appeal. *People v. Smallwood*, 2024 IL App (5th) 210407, ¶ 39 (citing *In re R.M.*, 2022 IL App (4th) 210426, ¶ 46).

¶ 51    The defendant next maintains that Robinson's identification was unreliable given that the incident occurred at night in a location with poor outdoor lighting, arguing it was "particularly dark" due to the time of night in combination with the neighborhood's substantial tree cover and

17

minimal outdoor lighting. The State counters that while the defendant presented video and photographic depictions of the scene taken in 2022, the trial evidence showed that the conditions at the scene were different in 2021 when the shooting occurred. The trial court took judicial notice that there was no cloud cover on the night of the shooting in 2021, and the moon was almost entirely lit; while in 2022, there was 75% more cloud cover, and the moon was far less lit up than on the night of the shooting.

¶ 52    The State argues that while the defendant emphasizes the poor outdoor lighting, he fails to acknowledge the additional illumination that would have come from Robinson's headlights. While it is a reasonable inference that Robinson had his headlights on as he was driving at night towards the intersection, none of the videos shown to the jury account for this additional lighting that would have allowed Robinson the opportunity to view the defendant shooting at him. Additionally, there were streetlights on the block; there was no cloud cover on the night of the shooting; and the moon was almost entirely lit. We find the State's argument persuasive. Accordingly, viewing the evidence in the light most favorable to the State, as we must, we find this factor weighs in favor of the State.

¶ 53    The defendant next suggests that given the chaos of the moment, the presence of a firearm, and the stressful situation created by the shooting, Robinson would have been impeded from making a reliable identification, rendering it improbable that he could see any identifying features of the shooters. We note that the same arguments could be made in most shooting situations and, therefore, reject the defendant's invitation to speculate as he fails to identify any evidence in the record supporting this argument. Based on our review of the record, it is reasonable to conclude that Robinson had a sufficient opportunity to observe the defendant on the night of the shooting. Thus, this factor does not weigh in favor of the defendant.

18

¶ 54                              2. Degree of Attention

¶ 55    As to the second *Biggers* factors, the defendant contends that Robinson's attention would have been focused on driving his vehicle when the gunshots began, at which point he turned his focus to survival, driving off in the opposite direction. The defendant maintains that whatever parts of Robinson's attention that were not focused on driving away would have been focused on the gunshots themselves, as opposed to who was doing the shooting. This argument conflicts with Robinson's trial testimony that as he was preparing to turn onto Cheryl Drive, he clearly saw the defendant, Nelson, and Gray standing in the driveway of the defendant's residence before the gunshots were fired in his direction. However brief the amount of time, Robinson's attention was focused on the shooters prior to the shots being fired. This factor does not weigh in favor of the defendant.

¶ 56                              3. Accuracy of Description

¶ 57    The defendant next argues that the accuracy of Robinson's description further demonstrates that his identification was unreliable. He goes on to emphasize inconsistencies in Robinson's initial statements to the police that he did not know Gray before that night and that Gray was not one of the shooters, before later reporting that Gray was the third shooter and the first to open fire on him. The defendant also emphasizes inconsistencies between statements Robinson initially made to the police versus his trial testimony. We do not find the defendant's argument persuasive as none of the inconsistencies point to an inaccuracy of Robinson's description of the defendant. Nor does it appear from the record that Robinson provided a description of the defendant; instead, he reported to the police the names of the individuals who shot at him on the night in question. This factor does not weigh in favor of the defendant.

¶ 58                              4. Degree of Certainty

¶ 59    Although the case cited by the defendant as additional authority calls into question the validity of this factor, Robinson expressed certainty that the defendant was the shooter in his uncontroverted trial testimony. *Johnson*, 2024 IL App (1st) 220494, ¶ 53. Thus, what little evidence exists on this factor weighs in favor of the reliability of Robinson's identification and not in favor of the defendant.

¶ 60                              5. Length of Time

¶ 61    Regarding the final *Biggers* factor, the defendant simply rehashes his previous arguments regarding Robinson's opportunity to view the shooters and his degree of attention. Review of the record reveals that immediately after the shooting, Robinson went to the police station to report the incident. This factor does not weigh in favor of the defendant.

¶ 62    After carefully examining the defendant's arguments in relation to the facts in the record, we find the totality of the *Biggers* factors support the reliability of Robinson's identification of the defendant as one of the shooters. "A single, positive identification by someone who had ample opportunity to observe the offender is sufficient to support a conviction." *People v. Conway*, 2023 IL 127670, ¶ 18; *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 63    The defendant next contends that Robinson's trial testimony was doubtful and inconsistent with statements he made to the police on the night of the shooting. He argues that Robinson had no answer for his changing accounts and that after the inconsistencies were pointed out while he was on the witness stand, he began to have trouble answering questions. He suggests that Robinson's trial testimony, including his identification of the defendant, might have been biased due to Robinson's recent romantic relationship with Lucille, the defendant's ex-wife. The defendant acknowledges that the jury's acceptance of trial testimony and assessment of a witness's

20

credibility are entitled to due deference and correctly notes that such determinations are not conclusive as a reviewing court "will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 64 To the extent that there were conflicts in Robinson's trial testimony, it was the function of the jury to resolve them. *People v. McPherson*, 306 Ill. App. 3d 758, 766 (1999). The inconsistencies identified in Robinson's testimony do not usurp the role of the jury in resolving conflicts. *People v. Woodson*, 2023 IL App (1st) 191353, ¶ 67 (it is the jury's duty to resolve conflicts in witness testimony, weigh evidence, and draw reasonable inferences). "All reasonable inferences are drawn in favor of finding a guilty verdict." *Id.* ¶ 68. We cannot say that the evidence was so unreasonable, improbable, or unsatisfactory as to cause a reasonable doubt of the defendant's guilt.

¶ 65 B. Ineffective Assistance of Counsel

¶ 66 The defendant claims defense counsel made two critical errors that allowed the State to argue that the cell phone belonged to him and insinuated that Robinson's cell phone contained additional, unintroduced evidence incriminating the defendant. He argues that together, these errors prejudiced him because it made it appear that Robinson's testimony was independently corroborated and undermined the outcome of the trial. We will examine each claim in turn.

¶ 67 A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. To establish counsel's deficient performance, a defendant must show that "counsel's

21

performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 694). Whether counsel was ineffective is a mixed question of fact and law. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222. "[T]he ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal." *Id.*

¶ 68    Initially, the defendant maintains he received ineffective assistance where trial counsel failed to object to a leading question when the prosecutor asked Robinson "Do you know this phone number? It's area code (217)-991-2736." He argues that by failing to object, defense counsel allowed the State to connect the cell phone to the defendant through improper means.

¶ 69    Leading questions are, by definition, suggestive. "A 'leading question' is one 'that suggests the answer to the person being interrogated; espec[ially] a question that may be answered by a mere "yes" or "no." ' " *People v. Miles*, 351 Ill. App. 3d 857, 866 (2004) (quoting Black's Law Dictionary 897 (7th ed. 1999)). Here, Robinson was free to answer that he did not know the individual associated with that cell phone number; thus, the record does not support the defendant's claim that the State improperly suggested the answer. Accordingly, the defendant's challenge fails because the State's question was not leading.

¶ 70    The defendant next argues that trial counsel's failure to object when the prosecutor insinuated during closing argument that there was incriminating information on Robinson's cell phone that was not introduced into evidence fell below an objective standard of reasonableness. Specifically, the defendant complains the following statement by the prosecutor was improper:

22

"[Robinson] said no, let me show you in my phone. Defense shut that down pretty quick. They didn't want you to see what was in his phone because they know exactly what it would have shown."

¶ 71 The defendant maintains the insinuation that there was additional evidence on Robinson's cell phone left the jury free to speculate as to the severity of that evidence without any corroboration that it even existed. In support of his argument, the defendant relies on *People v. Williams*, 2023 IL App (1st) 192463. In *Williams*, the defendant contended that the following remarks by the prosecutor in closing argument were improper because no evidence had been introduced at trial that the police had received an anonymous tip:

"' 'When you have in your own life experience you are aware that often law enforcement ask [*sic*] for anonymous tips, murders, serious violent crimes. Call in. There may even be an award for an anonymous tip. We will keep your identity secret.

So you got [*sic*] to ask yourself how valuable is that. Because an anonymous tip wouldn't get you into this courthouse. Anonymous tipsters can't testify. They are not of any evidentiary value.

What it is it's an investigatory tool. It helps police get the case started.' " *Id.* ¶¶ 136-37.

The *Williams* court held that the "argument improperly insinuated that additional inculpatory evidence existed that the jury did not hear due to evidentiary rules." *Id.* ¶ 140.

¶ 72 While it is true that an insinuation which leaves the jury to speculate may be more prejudicial than erroneously admitted evidence (*People v. Emerson*, 97 Ill. 2d 487, 497 (1983)), we find that, when reviewed in context, the complained-of remark in the instant case falls far short of that standard. "Reviewing courts will consider the closing argument as a whole, rather than

23

focusing on selected phrases or remarks, and will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). Contrary to the argument made in *Williams*, the remark made by the prosecutor was brief and isolated in the context of a lengthy closing argument. Accordingly, we find that the remark was not prejudicial.

¶ 73    Failure to satisfy either prong of the *Strickland* standard negates a claim of ineffective assistance of counsel. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. "[I]f it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient." *People v. Johnson*, 2021 IL 126291, ¶ 53. " '[A]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' " *People v. Johnson*, 2021 IL 126291, ¶ 54 (quoting *Strickland*, 466 U.S. at 691). In order to satisfy the prejudice prong, it is necessary to show actual prejudice, not simply speculation that a defendant may have been prejudiced. *Id.* ¶ 55. In the instant matter, the defendant's claim fails to satisfy the prejudice prong of *Strickland*. Upon thorough review of the record, we find the defendant's claims of ineffective assistance of counsel are without merit as he has not shown that the outcome of his trial would have been different were it not for the complained-of remark.

¶ 74                                C. Excessive Sentence

¶ 75    The defendant argues that his 38-year sentence is excessive where the trial court failed to adequately weigh his potential for rehabilitation as an objective of the sentence. Specifically, the defendant maintains that his sentence is excessive in light of his rehabilitative potential, the objectives of sentencing, and the fact that his current sentence is essentially a life sentence.

24

¶ 76    The State counters that the defendant's course of conduct warranted the sentences imposed given the seriousness of the offenses. The State contends that the defendant's sentence is reasonable in light of his criminal history which included a 1987 felony conviction for robbery; 1988 and 1991 felony convictions for possession of a controlled substance with intent to deliver; a 1994 felony conviction for armed robbery; and a 2016 felony conviction for unlawful possession of a weapon by a felon. The presentence investigation (PSI) report included the defendant's two pending cases: one for unlawful possession of a controlled substance, cocaine, in case No. 2020-CF-221, and the other for attempt first degree murder for having shot at Robinson on November 29, 2021, in case No. 2022-CF-1680. Both cases were dismissed following the guilty verdicts in the instant case.

¶ 77    Under the Illinois Constitution, all penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Clemons*, 2012 IL 107821, ¶ 29. The balancing process conducted at sentencing requires the sentencing judge to carefully consider all the factors in aggravation and mitigation, including the nature of the crime, protection of the public, deterrence and punishment, as well as the defendant's rehabilitative potential, age, social history, criminal background, and education. *People v. Jackson*, 357 Ill. App. 3d 313, 329 (2005); *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 78    A reviewing court must afford great deference to the trial court's judgment regarding sentencing because the trial court, having observed the defendant and the proceedings, has a far better opportunity to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "In considering the propriety of a sentence, the reviewing court must proceed with great caution and

25

must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Id.*

¶ 79    While trial courts are required to determine penalties both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship, "[n]ot *all* criminal defendants must be given an opportunity for rehabilitation or else life imprisonment would not be constitutionally permissible." (Emphasis in original.) *People v. Bien*, 277 Ill. App. 3d 744, 755-56 (1996). The trial court is vested with the responsibility for balancing between rendering justice and rehabilitating the defendant. *Id.* at 756. The seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001).

¶ 80    Review of the record reveals that the trial court considered the PSI, the trial evidence, the parties' arguments, the defendant's statement in allocution, and all statutory and nonstatutory factors in aggravation and mitigation pertinent to the case before imposing a sentence proportionate to the offenses. In mitigation, the trial court considered that the defendant was in his mid-50s in age; had held employment in the past; and had been able to obtain college certificates while in DOC. The trial court also found it mitigation that the defendant did not intend to hurt the child that was struck by the stray bullet.

¶ 81    In aggravation, the trial court acknowledged the need to send a deterrent message that the defendant and people in the community cannot commit such crimes, and that "revenge and retaliation using weapons is completely inappropriate." The trial court noted the defendant's criminal history as well, commenting that defendant's 1986 robbery, 1994 armed robbery, and "weapons charge" were particularly concerning, as the defendant had "a history of using items that can scare people, threaten people or hurt people." The court added that the defendant had

26

completed mandatory supervised release in a prior case, but he committed the instant offenses immediately after such completion. The trial court also found as an aggravating factor that the defendant was linked to the November 2021 shooting, as had been admitted for a limited purpose in the instant case.

¶ 82    With regard to the aggravated battery charge, the trial court found the defendant did not intend to harm the juvenile who was shot in the arm. However, the trial court noted that the shooting had occurred in a residential area and that other innocent members of the community could have been harmed as well. The trial court also considered in aggravation the defendant's course of conduct in shooting in the direction of Robinson's car, noting that not all of the bullets hit the car which meant the bullets all went somewhere. The record also demonstrates that the trial court properly considered the nature and circumstances of the offenses, noting that there were multiple gunshots involving two victims, one who was not struck by a bullet and an innocent bystander who was struck by a stray bullet as she was working a puzzle in her bedroom that night. Ultimately, the trial court determined there was some mitigation, but substantial aggravation, and concluded that a sentence at the higher end of the sentencing range was appropriate. The trial court explicitly stated that it considered the rehabilitative potential of the defendant, but it did so in light of the seriousness of the offenses.

¶ 83    We find there is nothing in this record upon which to conclude that the trial court abused its discretion in fashioning the defendant's sentence. A sentencing court is not obligated to afford rehabilitative potential more weight than the seriousness of the offense. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995).

¶ 84    The defendant next argues that the 38-year sentence for attempt first degree murder exceeds the minimum 21-year sentence by 17 years. 720 ILCS 5/8-4 (West 2022). Hence, the defendant

27

urges this court to reduce his sentence to the statutory minimum of 21 years or, alternatively, remand for resentencing. The State notes that at the outset of the sentencing hearing, the parties agreed the sentencing range for count 3, attempt first degree murder, was a Class X felony with a sentencing range between 6 and 30 years, plus an additional 15-year firearm enhancement, making the total range between 21 and 45 years in prison to be served at 85%. The parties also agreed that the range for count 4, aggravated battery with a firearm, was between 6 and 30 years, and that any such sentence would be served at 85%. Additionally, the State noted it would be dismissing the two pending cases, 20-CF-221 and 22-CF-1680.

¶ 85    While a reviewing court is not meant to be a "rubber stamp" for a trial court's sentencing decision, *People v. Daly*, 2014 IL App (4th) 140624, ¶ 26, *abrogated on other grounds*, a reviewing court may only disturb a sentence within statutory limits if the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16.

¶ 86    Under the facts presented here, we cannot say that the sentence greatly varies from the spirit and purpose of the law nor is it manifestly disproportionate to the nature of the offenses; that is, attempt first degree murder and aggravated battery with a firearm. Affording great deference to the trial court's judgment, as we must, we find the trial court did not abuse its discretion in fashioning the defendant's 38-year sentence.

¶ 87    The defendant next argues that during its sentencing determinations, the trial court improperly considered conduct for which he had been acquitted. In fashioning a sentence, a trial court may not consider prior arrests or charges that did not result in conviction. *People v. Shumate*, 94 Ill. App. 3d 478, 488 (1981). A trial court abuses its discretion when it considers an improper

28

factor in aggravation. *People v. Minter*, 2015 IL App (1st) 120598, ¶ 147. The burden is on the defendant to affirmatively establish the sentence was based on improper considerations. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49.

¶ 88    The defendant maintains that while discussing the nature and circumstances of the offense, the trial court improperly considered evidence that the defendant personally discharged a firearm during the incident, despite the fact that the jury acquitted him of that conduct. Specifically, the defendant contends that the following two statements by the trial court were improper: "the Defendant shot more than one bullet and we don't know who actually shot the bullet that hurt the girl," and "[the defendant] was there with at least two other people, and each of them had their own guns and each was shooting many, many shots."

¶ 89    The defendant's argument is without merit. While it is true that the jury found the State failed to prove the defendant personally discharged a firearm for the purpose of the 25-year sentence enhancement, it nevertheless found the defendant guilty of aggravated battery with a firearm for knowingly discharging a firearm causing bodily harm to the juvenile who was struck in the arm by a stray bullet. Thus, the trial court's statements were not improper, and we do not find that the trial court improperly considered conduct for which the defendant had been acquitted.

¶ 90                                III. CONCLUSION

¶ 91    For the foregoing reasons, we affirm the trial court's judgment and sentence.


¶ 92    Affirmed.